2014 VT 70

## Progressive Casualty Insurance Company v. MMG Insurance Company

[103 A.3d 899]

No. 12-391

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 1, 2014

254

*Daniel L. Burchard* of *McCormick, Fitzpatrick, Kasper & Burchard, P.C.,* Burlington, for Plaintiff-Appellant.

*John D. Willey, Jr.* of *Boylan Associates, P.C.,* Springfield, for Defendant-Appellee.

¶ 1. **Reiber, C.J.** In this insurance coverage dispute, we revisit an issue that we first confronted in 2003. In *Colwell v. Allstate Insurance Co.,* we recognized an anomaly in our then-existing uninsured/underinsured motorist (UM/UIM) law for accidents involving multiple victims. 2003 VT 5, 175 Vt. 61, 819 A.2d 727. Because the law at that time required a strict "limits to limits" comparison, a party could be denied the benefits of a UIM policy that he purchased even though he did not recover the "limits" of a tortfeasor's liability policy. Thus, in some multi-victim cases, a party was better off, if injured by an uninsured, rather than underinsured, tortfeasor. Given the plain language of the statute, we left it to the Legislature to decide whether, and how, to address this issue. *Id.* ¶ 15. The Legislature responded by amending 23 V.S.A. § 941(f) to specifically address UIM recovery in multi-victim accidents. We are now asked to interpret this provision in the context of a single-car accident with multiple victims.

¶ 2. Plaintiff Progressive Casualty Insurance Company insured the vehicle involved in the accident here. Given the number of victims, the policy's liability coverage did not fully compensate at least one of the injured passengers. The parties disputed whether the injured passenger was therefore entitled to UIM benefits under Progressive's policy. Progressive argued that coverage was barred by certain exclusions in its policy. The trial court found Progressive's exclusions unenforceable as inconsistent with the definition of an "underinsured vehicle" set forth in 23 V.S.A. § 941(f). Progressive appeals, arguing that its exclusions should be enforced, and that it should not have to provide both liability and UIM benefits to the injured passenger. We agree with Progressive, and, therefore, reverse the trial court's decision.

¶ 3. The facts are undisputed. In September 2008, Casey Brown was seriously injured as a passenger in a single-car accident. The driver was solely responsible for the accident. The car was owned by Brown's mother and insured by Progressive. Progressive's policy (the "host-vehicle" policy) provided liability coverage with a combined single limit of $500,000 and UM/UIM coverage with a combined single limit of $500,000. Progressive paid out the liability

limit of the host-vehicle policy. Because Brown was one of several seriously injured passengers, he received only $247,672.50 in liability coverage. This amount did not fully compensate Brown for his injuries, and he filed a claim for UIM benefits.

¶ 4. Three policies provided potential UIM coverage. Brown had his own vehicle, which was insured through Progressive with UIM limits of $500,000 (Brown-Bellinger policy). Brown also had coverage through a MMG Insurance Company policy with UIM limits of $1,000,000. As indicated above, the parties disagreed whether there was additional UIM coverage available to Brown under the host-vehicle policy. MMG and Progressive contributed $200,000 each to settle Brown's UIM claim, reserving the right to bring a declaratory judgment action to determine each insurer's actual obligation. Progressive then filed this suit, and the parties filed cross-motions for summary judgment.

¶ 5. In its motion for summary judgment, Progressive argued that there was no UIM coverage available to Brown under the host-vehicle policy because of the policy's "owned-vehicle" and "covered-auto" exclusions. These exclusions state that an " 'underinsured motor vehicle' does not include any vehicle that is either . . . owned by or available for the regular use of you or a relative; [or] . . . that is a covered auto." As stated above, Brown's mother owned the host vehicle and the car was covered by her Progressive policy. Progressive argued that the language of its exclusions was unambiguous and enforceable. Based on these arguments, Progressive maintained that it should have paid only one-third of the $400,000 settlement with Brown ($133,333.33) rather than the $200,000 that it actually contributed.[1]

¶ 6. MMG argued that the policy exclusions were not enforceable because they purported to eliminate UIM coverage mandated by statute. It cited 23 V.S.A. § 941(f), as amended in 2005, which provides that:

---

[1] Progressive arrived at this value as follows. If Progressive was correct that additional UIM coverage was not available to Brown under the terms of the host-vehicle policy, then the coverage available to Brown under the terms of the other two. policies should have been prorated based on the respective coverage limits of those two policies because both of those policies purported to provide excess coverage. Because the MMG policy afforded twice as much UIM coverage as the Brown-Bellinger policy, the rule of apportionment meant Progressive should have paid only one-third of the $400,000 settlement with Brown.

a motor vehicle is underinsured to the extent that: (1) the liability insurance limits applicable at the time of the accident are less than the limits of the uninsured motorist coverage applicable to the insured; or (2) the available liability insurance has been reduced by payments to others injured in the accident to an amount less than the limits of the uninsured motorist coverage applicable to the insured.

¶ 7. MMG asserted that because Brown did not recover $500,000 in liability coverage (given the payments made to other passengers), the vehicle was underinsured under § 941(f)(2), and Progressive was therefore obligated to provide up to $500,000 in UIM coverage to Brown. MMG maintained that Progressive's exclusions frustrated the purpose of the statute by purporting to make the host-vehicle UIM coverage "purchased by the owner for the benefit of the insured passenger" unavailable to him. Thus, according to MMG, Progressive owed Brown $252,327.50 in UIM benefits.[2]

¶ 8. The trial court agreed with MMG. It found that 23 V.S.A. § 941(f)(2) clearly invalidated the owned-vehicle exclusion in the multiple-claimant setting. It construed the statute to require "gap" coverage from the host-vehicle policy for the difference between the amount paid in liability benefits and the stated UM/UIM limit. The court found that any policy arguments about the economic purpose of UM/UIM coverage must give way to the plain language of the statutory amendment. In reaching its conclusion, the court considered *Hubbard v. Metropolitan Property & Casualty Insurance Co.*, 2007 VT 121, 182 Vt. 501, 944 A.2d 891, a case that similarly involved a single-car accident and a request for both liability and UIM coverage under the same policy. The court found that *Hubbard* provided only the most general guidance because it did not involve multiple claimants and it did not apply the amended version of § 941(f). Ultimately, the court granted

---

[2] MMG posited that the host-vehicle policy must provide UIM coverage to Brown up to $500,000, and that Progressive was entitled to offset the $247,672.50 it had paid Brown under the liability insurance coverage against that amount. This resulted in UIM benefits due to Brown under the host-vehicle policy of $252,327.50. MMG maintained that Progressive should pay Brown this amount, and that the UIM settlement paid to Brown in excess of $500,000 should be prorated between MMG and Progressive in accordance with the respective terms and coverage limits of the MMG and Brown-Bellinger policies.

summary judgment to MMG and ordered Progressive to provide $252,327.50 in UIM coverage, the difference between the liability coverage ($500,000) and the liability payment provided ($247,672.50). This appeal followed.

¶ 9. Progressive argues that the court erred in reaching its decision, and that it is entitled to summary judgment in its favor. It maintains that enforcement of its exclusions is consistent with *Hubbard* and the purpose of Vermont's UIM statute because no gap in coverage will result. According to Progressive, the trial court's conclusion is at odds with the purpose of the UIM statute and leads to absurd results.

¶ 10. ■ ■ We review the court's summary judgment decision de novo, applying the same standard as the trial court. *Hubbard*, 2007 VT 121, ¶ 6. Summary judgment is appropriate if the material facts are undisputed and any party is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56. The issue here is whether Progressive's policy exclusions violate § 941. See *Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. 496, 507, 536 A.2d 914, 921 (1987) (explaining that courts should give effect to the plain meaning of an insurance policy absent ambiguity, a statutory violation, or inherently unfair or misleading language). Looking at the language of § 941, as well as the reason and spirit of the law, we agree with Progressive that its policy exclusions are consistent with the law and enforceable. See *In re Wal\*Mart Stores, Inc.*, 167 Vt. 75, 84, 702 A.2d 397, 403 (1997) ("[I]n determining legislative intent, we look . . . to the whole statute, the subject matter, its effects and consequences, and reason and spirit of the law." (quotations omitted)).

¶ 11. ■ We begin with the purpose of our UM/UIM statute, which we have repeatedly stated is "to provide the prudent motorist with maximum insurance coverage when involved in an accident with a marginally insured (or uninsured) motorist." *Feeley v. Allstate Ins. Co.*, 2005 VT 87, ¶ 8, 178 Vt. 642, 882 A.2d 1230 (mem.) (citations omitted); see also *Hubbard*, 2007 VT 121, ¶ 7 (stating that Vermont law requires UM/UIM coverage "to protect the insured from the misfortune of being involved in an accident with a fiscally irresponsible driver" (brackets omitted)).[3] UM/UIM

---

[3] The dissent argues that we take too narrow a view of the statute's purpose by refusing to make available to an injured party both liability and UIM coverage

coverage is essentially "self-insurance," e.g., "[b]y purchasing the mandated UM/UIM coverage, the insured is guaranteed at least that amount of recovery regardless of a lower level of liability insurance purchased by a tortfeasor." *Hubbard*, 2007 VT 121, ¶ 10. Such coverage is "portable," meaning that it follows the person who purchased it and provides him or her with protection "wherever they become victims of an uninsured or underinsured motorist." *Monteith v. Jefferson Ins. Co. of New York*, 159 Vt. 378, 382-83, 618 A.2d 488, 490-91 (1992).

¶ 12. Prior to its amendment in 2005, § 941(f) provided that "a motor vehicle is underinsured to the extent that its personal injury limits of liability at the time of an accident are less than the limits of uninsured motorists coverage applicable to any injured party legally entitled to recover damages under said uninsured motorist coverage." 23 V.S.A. § 941(f) (2004). We described Vermont's approach to mandatory UM/UIM coverage as providing " 'gap coverage' intended only to place the insured in the same position as if, at the time of the accident, the tortfeasor had liability coverage equal to the insured's UIM coverage." *Colwell*, 2003 VT 5, ¶ 14; see also *Hubbard*, 2007 VT 121, ¶ 7 ("By purchasing UM/UIM coverage, an insured ensures that, in the case of an accident with an uninsured or underinsured tortfeasor, his UM/UIM policy will fill the 'gap' between the tortfeasor's available liability insurance and the UM/UIM protection purchased by the insured.").

¶ 13. We noted that this is one of two general approaches taken by states in addressing mandatory UIM coverage. *Colwell*, 2003 VT 5, ¶¶ 12-13. The other approach, often called "excess coverage," "deems a tortfeasor underinsured when the injured party's damages exceed the tortfeasor's liability coverage." *Id.* ¶ 12. A variant of this approach "requires insurers to provide UIM coverage to the extent that the amount actually available to the injured party from the tortfeasor's policy was less than the UIM coverage limits stated in the injured party's policy." *Id.* ¶ 13 (citing *Motorists Mut. Ins. Co. v. Andrews*, 604 N.E.2d 142, 144-46 (Ohio 1992) (concluding that insured was entitled to the UIM coverage that he had purchased even though tortfeasor's policy limit was greater

---

under the same policy. *Post*, ¶ 39. The law simply does not yield this result. When a tortfeasor has caused damage, it is not unfair, or contrary to public policy, to limit an insured's recovery under a tortfeasor's policy to liability coverage. To do otherwise skews the meaning of the words liability limits in any insurance policy.

than the insured's policy limits because claims of multiple victims resulted in undercompensation of the insured's injuries) (additional citations omitted)).

¶ 14. As referenced above, we recognized a shortcoming in our UM/UIM law in *Colwell*, 2003 VT 5, where the plaintiff was injured in a multi-car accident. The tortfeasor there, who was driving a different car than the plaintiff, had a single-limit liability policy with $50,000 in coverage, which was insufficient to pay all claims arising out of the accident. The plaintiff had her own insurance policy, which provided $50,000 in single-limit UM/UIM coverage. The plaintiff settled with the tortfeasor's insurer for $34,473 and looked to the UIM coverage in her own policy for additional compensation. The insurer denied her claim. It asserted that there was no "gap" in coverage because the tortfeasor's liability limit was the same as the plaintiff's UM/UIM limit, thus, the tortfeasor's vehicle was not "underinsured." The trial court agreed with the insurer. We upheld the court's decision on appeal, finding it consistent with the plain language of § 941(f).

¶ 15. In reaching our decision, we recognized that § 941, in its current form, did "not fully address the problem of UIM benefits in multiple-victim accidents" because in some multi-victim accidents "more compensation [was] available to satisfy an injured motorist's damages when the tortfeasor has no insurance at all." *Id.* ¶¶ 10, 15 (observing that in enacting law, Legislature focused on fixing anomaly that existed between recoveries obtainable from uninsured tortfeasors and underinsured tortfeasors, and failed to appreciate how statute would operate in multi-victim accidents). We noted that even if we agreed with the plaintiff that the result in her case was unfair, it was the role of the Legislature, rather than the Court, to decide if, or how, to fix the statute, and to determine if the statute should reflect the "excess coverage" policy other states had adopted or remain a "gap coverage" provision. *Id.* ¶ 15. As we specifically stated, "[t]he Legislature must determine whether a problem in this area exists, and if so, what is the best way to solve it." *Id.*

¶ 16. The Legislature responded to our decision. It directed the Department of Banking, Insurance, Securities, and Health Care Administration (BISHCA) to report to the General Assembly on underinsured motorist coverage in Vermont by January 15, 2004,

which BISHCA did.[4] See Act No. 62, § 2 (2003). It also proposed a bill, S.119, designed to address the problem identified in *Colwell.*[5] See S.119, 2003-2004 Gen. Assem., Bien. Sess. (Vt. 2003).

¶ 17. Although S.119 died in the House, the House proposed a bill the following session that included the same essential language (absent the arbitration provision, which apparently led to the demise of S.119). This bill, with a minor modification by the Senate regarding its effective date, became law in May 2005. 2005, No. 9, § 1.

¶ 18. The legislative history of this bill shows that the Legislature intended only to "fix" the problem identified in *Colwell.* Legislative counsel expressly so stated in providing an overview of the bill to the House Commerce Committee. This sentiment was

---

[4] BISHCA was specifically charged with: (1) analyzing claim payments prior to *Colwell* to determine if the common practice of insurance companies conformed with this Court's interpretation of § 941(f); (2) analyzing whether companies had adjusted rates or coverage as a result of *Colwell*; (3) analyzing S.119 and whether the proposed statutory modifications would result in a modification of rates or coverage for underinsured motorists; (4) examining whether insurers are required to notify an insured that underinsured payments are reduced when there are multiple claimants on an underinsured motorist policy; and (5) examining how other states address multiple claims against an underinsured motorist policy.

[5] As passed by the Senate, S.119 proposed to modify the then-existing language in § 941 as follows:

(f) For the purpose of this subchapter, a motor vehicle is underinsured to the extent that ~~its personal injury limits of liability at the time of an accident are less than the limits of uninsured motorists coverage applicable to any injured party legally entitled to recover damages under said uninsured motorist coverage~~ the liability insurance limits applicable at the time of the accident:

*(1) are lower than the limits of the underinsured motorist coverage applicable to the insured; or*

*(2) have been reduced by payments to others injured in the accident to an amount less than the limits of the underinsured motorist coverage applicable to the insured.*

The Senate bill also included a mandatory arbitration provision. See S.119 (proposing to include a new subsection (h) to provide: "Notwithstanding section 5653 of Title 12, a claim brought against an insurer for uninsured or underinsured motorist coverage shall be submitted to arbitration under chapter 192 of Title 12, unless the insurer and the claimant both agree to resolve the claim in court. An arbitration award made under this subsection shall not exceed the amount of uninsured or underinsured coverage available. This subsection shall not apply to a claim for bad faith.").

echoed by every witness who testified before the House Commerce Committee that day, either for or against the bill. Indeed, a lobbyist for a group of insurance companies expressed support for the bill because it was "narrowly tailored to address *Colwell*." Various witnesses testified that the bill was unlikely to have any significant impact on insurance rates in the state.

¶ 19. Peter Young, an associate general counsel for BISHCA, also testified before the House Commerce Committee. He reiterated that the bill was a direct response to *Colwell*, and that it was designed to ensure that injured persons had access to their own UIM coverage. That this was the bill's intent was restated by various witnesses and committee members, including the committee chairman, when the bill was considered by the Senate Judiciary Committee.

¶ 20. ■ ■ Consistent with legislative intent and the plain language of the statute, we conclude that, as applicable to this single-car accident case, the law now allows an injured individual to recover UM/UIM benefits under policies that he or she had purchased when a tortfeasor's liability insurance has been depleted by payments to multiple victims. In other words, rather than engaging in a strict limits-to-limits analysis in multi-victim accidents as in *Colwell*, it is now appropriate to consider how much an injured party actually recovers under a liability policy and to compare that value to the limits of the victim's own UM/UIM policies. Vermont's statute now embraces both a "gap coverage" and "excess coverage" approach. For purposes of this case, that means that the victim can claim the benefit of his or her own UIM policies to the extent that the limits of his or her UM/UIM coverage exceed the liability recovery.[6]

---

[6] The dissent argues that the UIM coverage in the host-vehicle policy is "applicable" to Brown, but this ignores the effect of Progressive's exclusions, which render such coverage inapplicable to Brown. *Post*, ¶ 34 n.10. As the dissent recognizes, it is difficult to avoid circular reasoning on either side of the issue. *Post*, ¶ 34. Nonetheless, the legislative history shows that the bill was a direct response to *Colwell* and it makes clear that the intent was to allow victims to recover under policies that they had purchased and believed would be available to them. There was no discussion whatsoever about recovering UIM benefits and liability benefits under the same policy, and as the dissent acknowledges, it is a concept that most, if not all, courts have rejected. *Post*, ¶ 46. The legislators expressed caution in making changes to the statute, and if they intended to enact such a novel and significant change in the law, certainly, they would have discussed

¶ 21. ■ We do not read § 941 to require an insurer effectively to provide "double liability insurance," a concept that we rejected in *Hubbard*, 2007 VT 121, and an approach that has been uniformly rejected by other courts. Our interpretation is consistent with the purpose of the law, with *Hubbard*, and with the conclusions reached by courts in other states.

¶ 22. As previously noted, *Hubbard* involved the pre-amendment version of § 941(f). In *Hubbard*, the plaintiffs' son was a passenger who died in the single-car accident. The tortfeasor-driver had an insurance policy, issued by Concord Mutual Insurance Company, which provided $100,000 in liability insurance and $100,000 in UM/UIM insurance. The plaintiffs held two policies, issued by Metropolitan Property and Casualty Company, each of which provided $100,000 in UM/UIM coverage. The plaintiffs' damages exceeded the available liability coverage. Concord paid $100,000 to the plaintiffs under the liability portion of its policy to settle the plaintiffs' claim, leaving in dispute the amount owed to the plaintiffs under both the Concord policy and the two policies held by the plaintiffs.

¶ 23. The plaintiffs argued that they had $300,000 in available UM/UIM coverage: $100,000 UM/UIM from Concord offset by the $100,000 Concord liability payment, which would then leave $200,000 UM/UIM coverage due under the plaintiffs' Metropolitan policies. Metropolitan argued that Concord did not owe the plaintiffs any UM/UIM benefits because Concord's policy expressly excluded UM/UIM coverage for injuries sustained in a vehicle owned by the insured that was insured for liability under the same contract. Thus, according to Metropolitan, it owed only $200,000 in UM/UIM benefits, which should be offset by Concord's $100,000 settlement payment. Metropolitan would then owe the plaintiffs $100,000 rather than $200,000 under its UM/UIM policies.

¶ 24. In a summary judgment decision, the trial court agreed with Metropolitan, finding that Concord's owned-vehicle exclusion was enforceable. The court reasoned that if the negligent driver had obtained the same amount of insurance as the plaintiffs, there

---

it. We note, moreover, that several legislators expressed concern, and were reassured, that the effect of the new law on insurance rates would be minimal. It is reasonable to assume that requiring insurers to pay out the limits of both liability coverage and UIM coverage in multi-victim accidents would have more than a minimal effect on rates.

would be $200,000 of liability coverage available to satisfy their claim. The plaintiffs' UIM policies provided coverage in that amount to bridge any gap caused by the driver's underinsurance. If the UIM coverage in the Concord policy was also available to the decedent, the plaintiffs would have access to more insurance than they purchased, i.e., $300,000 instead of $200,000. The court found that the UIM statute did not require such a result. It thus concluded that Concord's exclusion was consistent with the law and enforceable.

¶ 25. We affirmed the court's decision on appeal. *Id.* ¶ 17. We rejected the plaintiffs' assertion (as with the dissent's here) that the owned-vehicle exclusion was inconsistent with the statutory goal of portability of UM/UIM coverage, or that it impermissibly prohibited the stacking of all available UM/UIM coverage in contravention of case law and the mandate of § 941. *Id.* ¶¶ 13-14. We found that the owned-vehicle exclusion in no way restricted the plaintiffs' rights to collect UM/UIM benefits under their own UM/UIM contract with Metropolitan.[7] *Id.* ¶ 14. We concluded that the Concord policy "satisfied the statutory mandate for gap insurance," and that the application of its "owned-vehicle exclusion meant only that the insured may not recover under both the liability portion and the UM/UIM portion of the same contract." *Id.* Ultimately, we determined that "[a]llowing [the] plaintiffs to recover under both the driver's liability policy and his UM/UIM coverage for injuries received from that driver would convert the driver's UM/UIM coverage into double liability insurance — a result neither intended by the statute, nor . . . intended by the parties to the Concord insurance contract." *Id.*

¶ 26. ■ As we further explained, "UM/UIM policies are not intended by the statute to increase the overall amount of recovery, but to restore the insured to the position he would have been in

---

[7] We also observed, sua sponte, that there was no "gap" between the level of liability coverage ($100,000) and UM/UIM coverage ($100,000) provided within the Concord policy itself. *Id.* ¶ 14. It is not clear why this statement was included in *Hubbard.* No party argued this point in their briefs, the trial court made no finding to this effect, and no case law was cited in support of such an approach. It was certainly not the essential rationale for our decision in *Hubbard,* as the dissent posits. *Post,* ¶ 46. We do not find this observation compelling here, and it does not inform our interpretation of the amended version of § 941(f). The footnote in *Hubbard,* 2007 VT 121, ¶ 14 n.4, which contains a hypothetical cited by the dissent *post,* ¶ 40, is dicta and equally unpersuasive here.

had the other driver carried equally responsible insurance coverage." *Id.* ¶ 9. As in *Hubbard*, if we allowed the victim here to have access to the UM/UIM coverage in the host-policy, he would have access to more protection than he purchased. See *id.* ¶ 17 (finding policy goals of § 941 fully achieved where plaintiffs were able to recover the $200,000 in UM/UIM protection that they had purchased, and thus, were in same position as if driver-tortfeasor had carried same amount of liability coverage as UM/UIM coverage that plaintiffs purchased). In this case, Brown purchased $1,500,000 in UIM coverage to fill any "gap" that might arise should he be the victim of an uninsured or underinsured driver. He did not purchase $2,000,000 in UM/UIM coverage, which is what would be made available to him were we to endorse the approach advanced by MMG. The fact that the vehicle here was "underinsured" under either provision of § 941 means only that, unlike the plaintiff in *Colwell*, Brown could recover under the UM/UIM policies that he purchased even if his UM/UIM limits were the same as the liability limit in the host policy.[8] Like *Hubbard*, the exclusions in Progressive's host policy do not infringe on the purpose of § 941, nor do they interfere with Brown's ability to collect UM/UIM benefits under the policies that he purchased.

¶ 27. This approach also avoids creating anomalous results for accidents involving uninsured, as opposed to underinsured, vehicles. If the vehicle here was *uninsured*, there is no question that Brown would have to look solely to his own UM/UIM policies for coverage. The same holds true for an underinsured vehicle, and in both cases, the insured receives the benefit of the "self-insurance" that he purchased.

---

[8] The vehicle here was underinsured for purposes of Brown's recovery under his own policies based on either provision of § 941(f): (1) the liability insurance limits applicable at the time of the accident ($500,000) were less than the limits of the uninsured motorist coverage applicable to the insured ($1,500,000); and (2) the available liability insurance ($500,000) had been reduced by payments to others injured in the accident to an amount ($247,672.50) less than the limits of the uninsured motorist coverage applicable to the insured ($1,500,000). We note that the application of each statutory provision creates a different "upper limit" that Brown could recover from his UM/UIM policies — he would have access to $1,000,000 in UM/UIM coverage under § 941(f)(1) and to $1,252,327.50 in UM/UIM coverage under § 941(f)(2). We need not decide which value should apply because Brown's total damages do not approach either upper limit. Brown's total damages were $647,672.50, $400,000 of which constituted UM/UIM benefits.

¶ 28. ■ A construction that rejects the imposition of "double liability insurance" is consistent with the purpose of the statute, with *Hubbard*, and with the "overwhelming majority of states" holding that one cannot recover under both the liability and UM/UIM provisions of the same insurance contract. *Id.* ¶ 15. The Illinois Appellate Court identified the reasons underlying the majority approach in *Mercury Indemnity Co. of Illinois v. Kim*, 830 N.E.2d 603 (Ill. App. Ct. 2005), reasons we found compelling in *Hubbard*, 2007 VT 121, ¶ 15.

¶ 29. In *Kim*, a tortfeasor failed to obey a stop sign, triggering a series of collisions. Three people died and three people were seriously injured. The tortfeasor had an insurance policy with liability coverage limits of $100,000 per person and $300,000 per accident and UM/UIM coverage with the same limits. The tortfeasor's liability insurance did not fully compensate the victims. The Kims, who were passengers in the tortfeasor's car, consequently sought to recover UIM benefits under the tortfeasor's policy. The insurer filed a declaratory judgment action, arguing that UIM coverage was unavailable to the Kims because the tortfeasor's car was not an underinsured vehicle as defined in its policy due to a covered-vehicle exclusion. The Kims asserted that this exclusion violated provisions of the state's underinsured motorist law and was therefore unenforceable.

¶ 30. The court rejected this argument, noting that the result that it reached — allowing an insurer to prevent the stacking of UIM coverage onto liability coverage under a single policy — was the same result reached by the overwhelming majority of other states that had considered the issue. 830 N.E.2d at 608 (citing cases). Courts reaching this conclusion pointed to the underlying purpose of UIM coverage, which is "to protect the insured from the negligent driving of *another*, underinsured driver, not of the driver with whom he is riding." *Id.* at 609 (emphasis added) (citing *State Farm Mut. Auto. Ins. Co. v. Shahan*, 141 F.3d 819, 822 (8th Cir. 1998) ("The typically envisioned situation arises when the driver of one vehicle is injured due to the negligence of another driver. If the second driver's liability coverage is insufficient to compensate for the first driver's injuries, the first driver may recover under his own underinsured motor vehicle policy."); *Liberty Mut. Ins. Co. v. Lund*, 530 N.E.2d 166, 168 (Mass. 1988) ("Underinsurance and uninsured motorist protection is not additional liability insurance but rather is limited personal accident

insurance chiefly for the benefit of the named insured." (quotation and additional citation omitted)); *Millers Cas. Ins. Co., of Tex. v. Briggs*, 665 P.2d 891, 895 (Wash. 1983) ("The owner of a vehicle purchases liability insurance to . . . protect passengers in the vehicle from his . . . negligent driving. He purchases underinsured motorist coverage to protect himself and others from damages caused by another vehicle which is underinsured.").

¶ 31. These courts also held, as we did in *Hubbard*, "that allowing a person to receive benefits under both the liability and underinsured motorist provisions of a single policy would amount to an impermissible rewriting of the policy to increase the liability coverage." *Kim*, 830 N.E.2d at 610 (citing *Kang v. State Farm Mut. Auto. Ins. Co.*, 815 P.2d 1020, 1022 (Haw. 1991)) ("[A]cceptance of Kang's argument would allow Kang to recover for Kim's negligence under both the liability and underinsurance provisions of the State Farm policy, which would in effect transform underinsured motorist coverage into liability coverage and thus create a duplication of liability benefits."); *Lund*, 530 N.E.2d at 168 ("To interpret uninsurance and underinsurance in the manner urged by the defendant[ ] would effectively convert a form of coverage which is distinct from automobile liability insurance . . . to additional liability coverage. . . . This we decline to do." (quotation omitted)); *Myers v. State Farm Mut. Auto. Ins. Co.*, 336 N.W.2d 288, 291 (Minn. 1983) ("The policy definition defining an 'underinsured motor vehicle' to exclude a vehicle owned by or regularly furnished or available to the named insured properly prevents this conversion of first-party coverage into third-party coverage."); *Peterson v. Colonial Ins. Co. of Cal.*, 686 P.2d 239, 240 (Nev. 1984) ("[I]f we concluded that [the victim] could recover both uninsured/underinsured benefits and liability or bodily injury benefits under a single policy, we would essentially be increasing the bodily injury coverage provided by the Colonial policy. We decline to so rewrite the policy."); *Briggs*, 665 P.2d at 895 ("The result of dual recovery in the instant case would transform underinsured motorist coverage into liability insurance.")); see also *Hubbard*, 2007 VT 121, ¶ 15 (reaching similar conclusion). Additionally, some courts "noted that allowing the stacking of underinsured motorist coverage on to the liability coverage of the same policy would actually undercut the purpose of uninsured and underinsured motorist coverage statutes since they would serve to make such coverage prohibitively expensive." *Kim*, 830 N.E.2d at 611 (citing cases).

¶ 32. ■ The *Kim* court found these reasons persuasive and applicable to the exclusion at issue. We reached a similar conclusion in *Hubbard*, and find no basis to reach a different conclusion here. We cannot find from the language of § 941(f) that our Legislature intended to require insurers to provide double-liability coverage — an approach at odds with the role of UM/UIM coverage and at odds with the majority of other states — and we do not interpret the statute to so hold.[9] The statute must be interpreted consistently with its purpose, that is, "to protect the insured from the misfortune of being involved in an accident with a fiscally irresponsible driver," and to ensure that when an insured purchases mandatory UM/UIM coverage, he or she "is guaranteed at least that amount of recovery regardless of a lower level of liability insurance purchased by a tortfeasor." *Hubbard*, 2007 VT 121, ¶¶ 7, 10 (brackets omitted). Stated differently, such coverage is designed to "guarantee[ ] the protection of an injured insured against the possibility that a tortfeasor, over whom the insured has no control, purchases inadequate amounts of liability coverage." *Kim*, 830 N.E.2d at 612 (quotation omitted). The exclusions in Progressive's host-vehicle policy do not interfere with this purpose and they do not violate § 941. We therefore conclude that Progressive was entitled to summary judgment in its favor, and reverse the trial court's decision.

*Reversed and remanded for entry of judgment consistent with this opinion.*

¶ 33. **Robinson, J.,** dissenting. The Legislature has directed that:

> No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may be delivered or issued for delivery in this state . . . unless coverage is provided therein, or supplemental thereto, for the protection of persons insured thereunder who are legally entitled to recover damages, from owners

---

[9] The dissent maintains that all of the cases cited in *Hubbard* and *Kim* are distinguishable because no state has a statute exactly like that found in Vermont. *Post*, ¶ 43. We do not see how the policy reasons identified by these courts, which apply to the nature of liability and UM/UIM coverage in general, turn on particular statutory differences. The host-vehicle policy here would be providing double-liability coverage even if the limits of its liability coverage were paid out to numerous parties, as opposed to just one party.

or operators of uninsured, underinsured or hit-and-run motor vehicles . . . .

23 V.S.A. § 941(a). In light of this requirement, the enforceability of the "owned-vehicle" and "covered-vehicle" exclusions turns on our understanding of the statutory definition of "underinsured motor vehicle." The statute provides, in relevant part, that "a motor vehicle is underinsured to the extent that . . . the available liability insurance has been reduced by payments to others injured in the accident to an amount less than the limits of the uninsured motorist coverage applicable to the insured." *Id.* § 941(f)(2).

¶ 34. In applying this statute in the context of a single-car accident and a UM/UIM policy that contains the exclusions at issue, it is difficult to avoid circular reasoning on either side of the issue. Assume a passenger in a car with $300,000 single limit liability and UM/UIM coverages.[10] And assume a single-car accident in which the driver is at fault and several passengers are injured such that only $100,000 in liability coverage is available to cover our hypothetical injured passenger's $500,000 in damages. When determining whether the actually available liability insurance is less than the applicable UIM coverage, such that the car is underinsured as defined by statute, the starting point determines the end point. If we begin with an assumption that the host policy does *not* provide $300,000 UIM insurance to the injured passenger in this case, so that it is not "applicable to the insured," then the available liability insurance ($100,000) is not less than the limits of the applicable UIM insurance ($0). If, on the other hand, we assume that the host-vehicle policy UIM coverage *does* apply

---

[10] For the sake of simplicity, I am eliminating consideration of additional, portable UIM from this hypothetical. In light of the portable UIM insurance applicable to Casey Brown, the majority concedes that the vehicle in question is underinsured as defined by the statute, although it qualifies that concession by stating that the vehicle was "underinsured for purposes of Brown's recovery under his own policies." *Ante*, ¶ 26 n.8. I interpret this qualification to mean two things. First, the vehicle is underinsured, but its UIM coverage is not available for stacking with Casey Brown's portable UIM coverage. And, second, the *reason* for this is that the UIM coverage under the host-vehicle policy would not be available to Casey Brown without regard to the existence or applicability of any portable UIM coverage. That implicit conclusion, which both drives and flows from the majority's opinion, gets to the heart of the question here. For that reason, I analyze the enforceability of the exclusions at issue without the added complication of additional, portable UIM coverage unrelated to the host vehicle.

to the passenger, then the available liability coverage ($100,000) is substantially less than the applicable UIM coverage ($300,000). At some level, the "gap analysis" that is central to deciding this case does not add value to our consideration; it just validates the assumption we start with.

¶ 35. Nevertheless, I conclude that the trial court has the better end of the argument for several reasons. First and foremost, the plain language of the statute keys on "the uninsured motorist coverage *applicable to the insured.*" 23 V.S.A. § 941(f)(2) (emphasis added). It does not refer to the "portable UIM insurance" purchased by or for the insured, but instead calls for comparison of available liability coverage to *all* applicable UIM coverage. The majority's reasoning relies heavily on its assertion that the statute defining an underinsured motor vehicle calls for a comparison of the available liability insurance to the injured passenger's "own" UIM insurance, or the insurance purchased *by* the passenger, but not to UIM coverage applicable to the passenger through the host-vehicle policy. The majority acknowledges that the Legislature replaced a limits-to-limits comparison for determining whether a vehicle is underinsured with an analysis that considers how much an injured party can actually recover on a single-limit policy as compared with the available UIM coverage. *Ante*, ¶ 20. Citing legislative history suggesting that the Legislature made this change in response to a case in which the injured plaintiff's recovery was less than the limits of her own portable UIM coverage, the majority asserts that the statute's requirement of a comparison between actual recovery and UIM limits is confined to portable UIM coverage. In considering the UIM coverage available to the injured passenger in this case, the majority argues, we can only consider the coverage purchased by the injured passenger.

¶ 36. This distinction does not derive in any way from the text of the statute; rather, it is an additional qualification judicially grafted on to the statute. *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) ("It is inappropriate to read into a statute something which is not there unless it is *necessary* in order to make the statute effective."). The policy language in this case defines an "insured person" for purposes of UIM motorist coverage to include "any person occupying, but not operating, a covered auto." There is no question that if the tortfeasor in our hypothetical was the driver of a second car, our hypothetical passenger

would be entitled to $300,000 UM/UIM coverage through the host-vehicle policy. Under these circumstances, the majority's definition of "applicable" UIM coverage to include only portable UIM coverage purchased by (or presumably on behalf of) the passenger is squarely at odds with the plain language of the statute. *Daniels v. Elks Club of Hartford*, 2012 VT 55, ¶ 33, 192 Vt. 114, 58 A.3d 925 (stating that Court "will generally give a statute its plain meaning").

¶ 37. Moreover, the majority reads far more into the legislative history than it actually supports. I wholly agree that the Legislature amended § 941(f) in direct response to our decision in *Colwell v. Allstate Insurance Co.*, 2003 VT 5, 175 Vt. 61, 819 A.2d 727. But there is nothing in the legislative history to support the majority's contention that the shift from a limits-to-limits comparison to a comparison between UIM limits and actually available insurance given multiple claims applies with respect to an individual's portable UIM coverage but not to coverage pursuant to a host-vehicle policy. In *Colwell*, the injured plaintiff was apparently driving her car, so that the host-vehicle coverage and her portable coverage were one and the same. There is no discussion in the decision about a distinction between the coverage applicable to an individual through the host vehicle and that applicable by virtue of portable coverage based on a vehicle not involved in the accident. In analyzing the statute, which defined an underinsured vehicle with reference to the gap between the tortfeasor's liability limits and the "limits of uninsured motorists coverage *applicable to any injured party*," this Court concluded that it called for a limits-to-limits comparison. *Id.* ¶ 8 (emphasis added). In particular, we explained that Vermont had adopted a "gap coverage" scheme pursuant to which UIM coverage was available to fill the gap between the liability coverage and the limits of "the insured's UIM coverage." *Id.* ¶ 14. We did not limit the comparison to the insured's portable UIM coverage to the exclusion of the insured's UIM coverage through the host-vehicle policy; nor did we suggest that a distinction exists between the different types of available UIM coverage.

¶ 38. As the majority points out, the Legislature sought to reverse the outcome of *Colwell*, rejecting a pure limits-to-limits comparison with a comparison between the UIM coverage applicable to the insured and the coverage actually available in the context of a single-limit liability policy and multiple claimants.

Like this Court in *Colwell*, the Legislature focused on the impact of multiple claims against a single-limit liability policy in ascertaining whether an individual is underinsured. The Legislature never discussed a distinction between an individual's *portable* UIM coverage, and the UIM coverage available through the host vehicle, or suggested that its shift from a limits-to-limits comparison applied only to the former. The legislative history cited by the majority simply provides no basis for the majority's conclusion that the Legislature intended anything other than what it said when it defined a motor vehicle as underinsured "to the extent that . . . the available liability insurance has been reduced by payments to others injured in the accident to an amount less than the limits of the uninsured motorist coverage *applicable to the insured.*" 23 V.S.A. § 941(f)(2) (emphasis added).

¶ 39. The majority takes too narrow a view of the purpose underlying the statute governing UIM coverage. The majority notes our explanation in *Hubbard v. Metropolitan Property & Casualty Insurance Co.*, 2007 VT 121, ¶ 9, 182 Vt. 501, 944 A.2d 891, that UM/UIM policies are intended to "restore the insured to the position [the insured] would have been in had the other driver carried equally responsible insurance coverage." *Ante,* ¶ 26. But it then concludes that the only insurance relevant to determining the level of "responsible insurance coverage" carried by the passenger is the passenger's own, portable UIM. *Id.* As noted above, if our hypothetical passenger were injured by an uninsured tortfeasor driving a different car, our passenger would be entitled to $300,000 UM/UIM coverage through the host-vehicle policy. But the majority suggests that if the tortfeasor in this hypothetical is the driver of the car in which passenger is riding, the passenger will be limited to the $100,000 liability insurance recovery — far less than the level of "responsible insurance coverage" otherwise applicable to the passenger. The notion that the host vehicle's own policy could provide so much less UM/UIM coverage to a passenger injured by the driver of that vehicle than to a passenger injured by the driver of a different vehicle is incongruous.

¶ 40. Although this Court's opinion in *Hubbard* provides fodder for both sides of the debate, the analytical approach endorsed by this Court in *Hubbard* provides more support for the trial court's approach than for the majority's. Faced with the question of whether the "owned-vehicle" exclusion with respect to UIM coverage was enforceable against the UIM claim of a passenger who

sought to stack the host vehicle's UIM coverage with the passenger's own portable UIM coverage, this Court did not, as the majority does in this case, rule that the only relevant UIM coverage for the purpose of assessing whether the vehicle was underinsured was the passenger's own portable UIM insurance. Instead, this Court actually compared the limits of the available liability insurance to the UM/UIM coverage that would be available through the host policy if the exclusion did not apply, and concluded that there was no gap. *Id.* ¶ 14. We concluded that the owned-vehicle exclusion was "not at all inconsistent with the statute where, as here, the driver's liability and the insured passenger's UM/UIM coverages under the same . . . policy are equivalent." *Id.* We went on to explain that "[s]ince no gap in coverage can occur, the statute's purpose is neither defeated nor impinged upon by enforcement of the exclusion." *Id.* We noted:

> A different result could obtain if the driver's liability insurance was less than the UM/UIM coverage in the same policy, since the owned-vehicle exclusion would arguably frustrate the statutory purpose by purporting to make the UM/UIM coverage unavailable to fill the gap between the owner's inadequate liability coverage and the UM/UIM protection purchased by the owner for the benefit of the insured passenger.

*Id.* ¶ 14, n.4.

¶ 41. *Hubbard* did not involve liability coverage compromised in amount by multiple claimants, and did not implicate § 941(f)(2). Although we upheld the contractual exclusions in *Hubbard,* our reasoning in that case points to the opposite outcome in this case. If we compare the available liability coverage in this case — mindful of the Legislature's instruction that we should look at the actually available coverage in light of reductions in available coverage on account of payments to others injured in the accident — to the UM/UIM coverage that would be available to the hypothetical passenger if the exclusion did not apply, there *is* a gap in this case. The exact same methodology that we applied in *Hubbard* requires that we *not* enforce the contractual exclusion in this case. In fact, this is exactly the scenario contemplated in our footnote in *Hubbard* — the driver's liability insurance here *is* less than the UM/UIM coverage in the same policy, and application of the exclusions would frustrate the statutory purpose by purport-

ing to make the UM/UIM coverage unavailable to fill the gap between the owner's inadequate liability coverage and the UM/UIM protections "purchased by the owner for the benefit of the insured passenger." *Id.*

¶ 42. Finally, I am mindful of "the broad remedial purpose underlying the UM/UIM requirement." *Colwell*, 2003 VT 5, ¶ 23 (citing *Montieth v. Jefferson Ins. Co. of N.Y.*, 159 Vt. 378, 382, 618 A.2d 488, 490 (1992)). While the remedial purpose underlying the statute does not provide any basis for departing from the plain language of the statute, it is a relevant factor in the face of ambiguity in the statute. Although, as noted above, I do not find this statute ambiguous, to the extent that it is, maxims of statutory interpretation call for a broad construction consistent with the remedial purpose underlying the statute. *Town of Killington v. State*, 172 Vt. 182, 191, 776 A.2d 395, 402 (2001) (stating we construe remedial statutes liberally to accomplish their remedial purpose).

¶ 43. The majority cites numerous cases from other jurisdictions in support of its contrary conclusion, and suggests that its view is in line with "the overwhelming majority of states" that have considered the issue. *Ante*, ¶ 28. But the cases cited by the majority offer no support for this assertion because the law applied in those cases is not on all fours with Vermont's statute, and the issue before those courts was different. The only case cited by the majority in which the applicable statute requires "gap coverage" for underinsured motorists lacks the particular feature of Vermont law that impels me to vote to affirm the trial court's judgment in this case: a statute that defines "underinsured motorist" not with reference to the *limits of liability* of the tortfeasor's policy as compared with the available UIM coverage, but, rather, with reference to the difference between the actual liability coverage available in light of payments to others injured in the accident and the UM/UIM coverage available to a claimant. 23 V.S.A. § 941(f)(2); see *Mercury Indem. Co. of Ill. v. Kim*, 830 N.E.2d 603, 605 (Ill. App. Ct. 2005) ("[T]he term 'underinsured motor vehicle' means a motor vehicle . . . for which the sum of *the limits of liability* under all bodily injury liability insurance policies . . . is less than the limits for underinsured coverage provided the insured . . . ." (emphasis added) (citing 215 Ill. Comp. Stat. 5/143a-2(4) (2000))). The *Kim* decision provided solid support for this Court's ruling in *Hubbard*, but offers nothing to address the distinct legal and factual context of this case.

¶ 44. Moreover, three of the cases cited by the majority not only apply statutes that define an underinsured motor vehicle with reference to the liability insurance *policy limits*, without consideration of the coverage actually available in light of payments to others, but apply statutes reflecting what the majority has described as an unqualified "excess coverage" model, as opposed to a "gap coverage" approach. *Ante*, ¶ 13. These decisions offer little support for the majority's construction of our particular gap-coverage statute as impacted by § 941(f)(2). See *Kang v. State Farm Mut. Auto. Ins. Co.*, 815 P.2d 1020, 1021 (Haw. 1991) (defining "underinsured motor vehicle" as "a motor vehicle with respect to . . . which the sum of the limits of liability of all bodily injury liability insurance coverage applicable at the time of loss to which coverage afforded by such policy or policies applies is less than the liability for damages imposed by law" (citing Haw. Rev. Stat. § 431-448(c) (1986) (since recodified as Haw. Rev. Stat. § 431:10C-103(22)))); *Peterson v. Colonial Ins. Co. of Cal.*, 686 P.2d 239, 240 (Nev. 1984) ("Uninsured motorist coverage must include a provision which enables the insured to recover any amount of damages for bodily injury from his insurer to which he is legally entitled but which exceeds the limits of the bodily injury coverage carried by the owner or operator of the other vehicle." (citing Nev. Rev. Stat. § 687B.145(2) (1982))); *Millers Cas. Ins. Co., of Tex. v. Briggs*, 665 P.2d 891, 892-93 (Wash. 1983) ("An underinsured vehicle is defined by the statute as a vehicle with respect to which the sum of liability limits 'applicable to a covered person after an accident is less than the applicable damages which the covered person is legally entitled to recover.'" (quoting Wash. Rev. Code § 48.22.030(1))).

¶ 45. Finally, three of the cases cited by the majority, dating from an era when statutes governing underinsured motorist coverage were less ubiquitous, apply contract exclusions without the statutory overlay that is at the heart of this case. See *State Farm Mut. Auto. Ins. Co. v. Shahan*, 141 F.3d 819, 823 (8th Cir. 1998) (stating underinsured motorist coverage is not statutorily required in Missouri, and is "purely optional"); *Liberty Mut. Ins. Co. v. Lund*, 530 N.E.2d 166, 167-68 (Mass. 1988) (construing host-vehicle insurance contract that excluded liability coverage for passengers to also deny UIM coverage to passengers in connection with injuries caused by driver's negligence, such that passenger was not entitled to any recovery — liability or UIM —

through host-vehicle policy); *Myers v. State Farm Mut. Auto Ins. Co.*, 336 N.W.2d 288, 291 (Minn. 1983) (interpreting and enforcing contract with no reference to any statute). Insofar as courts in these cases merely interpreted contracts purporting to exclude UIM coverage for passengers, with no statutes potentially limiting the enforceability of the exclusions, these cases are irrelevant to the central issue here.

¶ 46. I freely admit that most courts have held that a "covered-vehicle" exclusion to underinsured motorist coverage is valid. As noted above, this Court held just that in *Hubbard*, 2007 VT 121. But in most, if not all of those cases, the injured passenger sought full coverage under the host vehicle's UIM policy in addition to liability coverage, rather than simply "gap coverage" to account for the difference between the available liability coverage and the host vehicle's UIM limits. The majority does not cite a single case in which the governing statute defines "underinsured motorist" the way Vermont's does. This distinction makes a huge difference. One of the critical rationales underlying the decision the majority leans on most heavily is that in a regime in which "liability and underinsured motorist limits are coextensive in an insured's policy . . . a situation would not arise where that insured's vehicle would be underinsured as to itself." *Kim*, 830 N.E.2d at 611-12. This was essentially our rationale in *Hubbard*. See 2007 VT 121, ¶ 14 ("[W]here, as here, the driver's liability and the insured passenger's UM/UIM coverages under the same Concord policy are equivalent," "no gap in coverage can occur."). In contrast, in a world in which "underinsured motorist" is defined with reference to the liability payments *actually available* to a person injured due to the driver's negligence, rather than the limits of the tortfeasor's liability policy, and in which multiple claimants draw from the same single-limit liability coverage, it is very easy to imagine that a vehicle may be underinsured "as to itself." *Kim*, 830 N.E.2d at 612. That's the legal framework of Vermont's UIM statute, and none of the cases cited by the majority purports to address this feature of Vermont law.

¶ 47. The majority suggests that the trial court's approach would increase the liability limits of the host-vehicle policy, or would convert the host vehicle's UIM coverage into "double-liability insurance." See *ante*, ¶¶ 26-28. I don't see why that is. Liability coverage and UIM coverage provide separate and distinct benefits under the policy. See *North River Ins. Co. v. Tabor*,

934 F.2d 461, 464 (3d Cir. 1991) (describing general approaches to UIM coverage — either filling a gap or providing excess coverage — in relation to but distinct from liability coverage). When the actual liability coverage available from a third-party tortfeasor is less than the limits of the UIM coverage applicable to the passenger through the host-vehicle policy, nobody suggests that the passenger's invocation of the host vehicle's UIM coverage converts that coverage into "liability" coverage. The whole point of UIM coverage is to make up for a shortfall in liability coverage relative to the UIM limits. That is true whether the tortfeasor happens to be the driver of the passenger's car, or the driver of a different car. I suspect that the oft-repeated assertion that the owned-vehicle exclusion prevents an injured passenger from getting "double-liability insurance" originated in cases, like those cited above, in which an injured passenger in a single-car accident sought UIM coverage through the host-vehicle policy above and beyond the liability coverage *even though* the UIM limits and the available liability coverage were the same — a very different circumstance from this case.

¶ 48. The majority also argues that the trial court's approach would give the passenger more UIM protection than the passenger had actually purchased. *Ante*, ¶ 26. That is not an incongruous result. If in this case, the passenger at issue had been injured by a tortfeasor driving a different car, he would unquestionably have been entitled to $2,000,000 in UIM coverage — $1,500,000 on account of portable policies purchased by him or on his behalf, and $500,000 on account of the UIM coverage applicable to him through the host-vehicle policy. In this scenario, he clearly would have the benefit of UIM coverage greater than the amount he purchased himself, and nobody would suggest that was an anomalous result. It is not at all clear why that should change because he was injured by the driver of the car in which he was riding, rather than the driver of a different car. The notion that the total coverage available for a passenger's injuries — liability plus UIM — is significantly less if the driver of the passenger's own car is the negligent one is anomalous.

¶ 49. The Legislature has specifically sought to ensure that UIM coverage be available to fill the gap between the liability coverage actually available to a person injured by a negligent driver, taking into account reductions in the available liability insurance due to payments to others injured in the accident, and the limits of the

UIM coverage applicable to the insured. The exclusions upheld by the majority in this case frustrate that purpose, and are incompatible with the express requirement of the statute. For that reason, I respectfully dissent.

¶ 50. I am authorized to state that Justice Dooley joins this dissent.