MISTICK, INC. and Northside Associates, Appellant,

v.

NORTHWESTERN NATIONAL CASUALTY COMPANY, Penn National Insurance and Donna Jeffrey, an Individual on Her Own Behalf and on Behalf of Her Minor Children, Andrea Jeffrey and Chauna Jeffrey, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 15, 2001.

Filed Aug. 14, 2002.

Robert E. Daley, Pittsburgh, for appellant.

Miles A. Kirshner, Pittsburgh, for Penn National, appellee.

Daniel B. McLane, Pittsburgh, for Northwestern, appellee.

Before JOHNSON, TODD, and HESTER, JJ.

JOHNSON, J.

¶ 1 This matter is on remand from the Supreme Court of Pennsylvania for consideration in light of that Court's decision in *Lititz Mutual Ins. Co. v. Steely*, 567 Pa. 98, 785 A.2d 975 (2001) (*Lititz II*). In this case, the trial court granted preliminary objections in the nature of a demurrer in favor of Northwestern National Casualty Company (Northwestern) and Penn National Insurance (Penn National). The court concluded that Northside's claim, which arises out of an underlying action claiming childhood lead poisoning, is barred from coverage by a pollution exclusion clause in the parties' insurance contracts. Upon review of the applicable exclusion, in light of *Lititz II*, we conclude that the court erred in granting the demurrer. Accordingly, we reverse the court's order and remand this case for further proceedings.

¶ 2 Northside commenced this action to compel Northwestern and Penn National to tender a defense and provide indemnity in a personal injury action filed by appellee Donna Jeffrey. Jeffrey asserted that her minor children sustained lead poisoning while the family resided in rental property owned by Northside. Jeffrey alleged that the children "were exposed to and did ingest toxic lead-based paint," and that the lead-based paint was the source of the toxic effects the children suffered. Jeffrey did not allege specifically how the children's exposure and ingestion of the paint occurred. Northwestern and Penn National refused to tender Northside's defense, contending that the occurrences Jeffrey alleged as the source of her children's injuries are excluded from coverage by an "absolute" or "total" pollution exclusion under the respective policies.

¶ 3 Consequently, Northside filed its complaint, seeking declaratory judgment and asserting causes of action for breach of contract and insurance bad faith. Northwestern and Penn National filed preliminary objections in the nature of a demurrer asserting that Northside's claim for coverage was barred by this Court's decision in *Lititz Mutual Ins. Co. v. Steely*, 746 A.2d 607 (Pa.Super.1999) (*Lititz I*). The trial court agreed and granted the demurrer, whereupon Northside filed this appeal. On our prior review, we distinguished this Court's decision in *Lititz I* and vacated the trial court's order. *See Mistick, Inc. v. Northwestern Nat. Cas. Co.*, 778 A.2d 743 (Pa.Super.2001) (unpublished memorandum). Northwestern and Penn National, in turn, petitioned for allowance of appeal to the Supreme Court of Pennsylvania. Subsequently, the Supreme Court reversed our decision in *Lititz I, see Lititz II*, 567 Pa. 98, 785 A.2d 975, and granted allowance of appeal in this case. *See Mistick, Inc. v. Northwestern Nat. Cas. Co.*, 567 Pa. 707, 790 A.2d 1011 (2002). In a *per curiam* order, the Supreme Court reversed our decision and remanded the case for further consideration in light of *Lititz II. See id.*

¶ 4 On remand, Northside has filed a supplemental brief incorporating and expanding its previous discussion of the exclusion issue in light of *Lititz II*. Its Statement of the Questions Presented, however, remains unchanged. Northside raises the following issues for our review:

I. Whether a Commercial General Liability insurance policy, which contains a provision excluding coverage for injuries arising out of the "discharge, dispersal, seepage, migration, release or escape" of "pollutants" provides coverage in the specific factual context of children

ingesting lead-based paint at their residence?

II. Even assuming the aforementioned insurance policy provision is unambiguous, is discovery relating to the issues of the reasonable expectations of the insured in purchasing the policy and regulatory estoppel necessary before a final determination of coverage can be made?

Before proceeding, we note that Penn National has settled Northside's claim and discontinued its participation in this appeal. Northwestern's appeal remains pending and the company has filed a supplemental brief opposing Northside's interpretation of *Lititz II* and arguing that additional language in its policy must be interpreted to exclude coverage of claims arising from ingestion or inhalation of lead-based paint.

¶ 5 On an appeal from an order sustaining preliminary objections in the nature of a demurrer, our scope of review is plenary, allowing us to review the whole record. *See Ham v. Sulek,* 422 Pa.Super. 615, 620 A.2d 5, 8 (1993). "In some contexts, when issues of fact are raised by preliminary objections, the trial court may receive evidence by depositions or otherwise." *Mellon Bank, N.A. v. Fabinyi,* 437 Pa.Super. 559, 650 A.2d 895, 899 (1994). "However, preliminary objections *in the nature of a demurrer* require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by a demurrer." *Id.* (emphasis added).

¶ 6 "The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Ham,* 620 A.2d at 9. Accordingly, our standard of review is to determine "whether the complaint adequately states a claim for relief under

any theory of law." *Id.* To evaluate a demurrer under this standard, the court must accept as true all material averments of the complaint and may sustain the demurrer only if the law will not permit a recovery. *See Fabinyi,* 650 A.2d at 899. "Where any doubt exists as to whether a demurrer should be sustained, it must be resolved in favor of overruling the demurrer." *Ham,* 620 A.2d at 9.

¶ 7 To discern an insurer's duty to tender a defense under the terms of an insurance contract, a reviewing court must ascertain the scope of coverage stated in the contract and analyze the allegations of the insured's complaint. *See Britamco Underwriters, Inc. v. Weiner,* 431 Pa.Super. 276, 636 A.2d 649, 651 (1994). "[T]he obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy." *Id.* "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999). Thus, unless the insurer establishes that the allegations of the insured's complaint fall within the stated scope of the exclusion, the court must deny its demurrer and require the insurer to tender a defense under the policy. *See id.; Britamco,* 636 A.2d at 651; *Ham,* 620 A.2d at 9.

¶ 8 In its first question on appeal, Northside challenges the trial court's decision that the respective "absolute" and "total" pollution exclusions bar coverage on the facts pled by Donna Jeffrey in the underlying action. In support of its challenge, Northside argues that our Supreme Court in *Lititz II* held that "in residential lead poisoning cases ... the so-called 'pol-

lution exclusions' do not apply as the mechanism of lead based paint 'dissemination' in a 'residential setting' is not within the exclusionary language...." Following consideration of *Lititz II* and review of the language of the exclusion in Northwestern's policy, we agree with Northside's conclusion that the exclusion as written does not exclude coverage of the claims of residential lead poisoning arising out of Jeffrey's complaint.

¶ 9 In *Lititz II*, the Supreme Court of Pennsylvania addressed whether an insurer could deny coverage of claims arising from ingestion of lead-based paint on the basis of a clause in its policy that excluded claims arising from the "discharge, dispersal, release, or escape" of pollutants. *See Lititz II*, 567 Pa. 98, 785 A.2d 975, 981 (2001). Initially, the Court acknowledged that lead-based paint did qualify as a "pollutant" within the meaning of the policy. The Court then determined, however, that the gradual process of cracking, chipping, and chalking by which lead-based paint degrades could not be characterized as "discharge, dispersal, release or escape." *See id.* at 981–82. Applying commonly understood meanings for each of the modes of dissemination described in the insurance policy, the Court reasoned as follows:

> One would not ordinarily describe the continual, imperceptible, and inevitable deterioration of paint that has been applied to the interior surface of a residence as a discharge ("a flowing or issuing out"), a release ("the act or an instance of liberating or freeing"), or an escape ("an act or instance of escaping").

*Id.* at 982. The Court reasoned additionally that although the cracking and chipping of lead-based paint could be characterized as "dispersal" within the meaning of the exclusionary clause, the term "dispersal" was itself ambiguous and rendered the clause internally inconsistent:

> Arguably [the deterioration of lead-based paint by cracking and chipping] could be understood to constitute a "dispersal," the definition of which ("the process ... of ... spreading ... from one place to another,") may imply a gradualism not characteristic of the other terms. Any such inconsistency in meaning simply indicates, however, that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous.

*Id.* Consequently, the Court required interpretation of the language in favor of the insured and determined that the exclusionary clause did not preclude coverage of claims arising from ingestion of lead-based paint.

■ ¶ 10 We find the court's reasoning in *Lititz II* dispositive of the matter before us. The exclusionary provisions at issue here state generally that bodily injury or property damage caused by pollution is not compensable. Northwestern's policy excludes from coverage the following:

> "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

The policy defines "pollutants" as follows:

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Assuming that lead-based paint conforms to the foregoing definition of "pollutant," we are compelled to conclude, as did the Court in *Lititz II*, that "discharge, disper-

sal, ... release or escape" does not include abrasion of lead-based paint. *See Lititz II,* 785 A.2d at 982. We determine accordingly that these terms do not preclude coverage of claims arising from ingestion of such abraded paint. *See id.*

¶ 11 Nevertheless, Northwestern argues that its additional policy language, excluding from coverage two other modes of dissemination, must be interpreted to exclude coverage of lead paint claims. We disagree. The additional modes of dissemination stated in the policy, i.e. "seepage" and "migration," do not contemplate the process of cracking and chipping that our Courts have found inherent in the abrasion of lead-based paint. *See Lititz II,* 785 A.2d at 981 (describing process by which lead-based paints abrade). Our Supreme Court has defined "seepage" as " 'the process of seeping,' that is, 'flow[ing] or pass[ing] slowly through fine pores or small openings.' " *See Madison Const. Co.,* 735 A.2d at 108. (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990)). Thus, "seepage" contemplates the movement of fluid substances. Lead-based paint, once dried on the walls of a residence, cannot be characterized as "seepage" or be said to "seep," because it flakes and chips as a solid. *See Lititz II,* 785 A.2d at 981.

¶ 12 The remaining manner of movement described by Northwestern's policy is "migration." Northwestern argues that this term, coupled with the provision's broad time reference ("at any time"), contemplates the gradual movement described by the Supreme Court as typical of lead paint and absent from the policy language in *Lititz II.* Again, we disagree. " 'Migration' is 'move[ment] from one country, place, or locality to another' or 'chang[ing] position in an organism or substance.' " *Madison Const. Co. v. Harleysville Mutual Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 108 (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990)). We acknowledge that this broad definition of movement may be sufficiently encompassing to include the gradual chipping of lead-based paint from the wall of a home. Nevertheless, like the term "dispersal," that our Supreme Court discounted in *Lititz II,* "migration" is a vague and general term inconsistent with the other terms used in the exclusion, i.e. discharge, release, seepage and escape. The provision's additional language, "at any time", on which Northwestern relies to establish "gradualism," does not ameliorate this ambiguity. Indeed, this phrase modifies the enumerated modes of movement by reference to a position in time, not duration of time. See WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990) (defining "at" as a preposition "5—used as a function word to indicate age or position in time"). Accordingly, "discharge, dispersal, seepage, migration, release or escape of pollutants *at any time* " describes the point in time at which movement occurs and does not expand or vary the quality of the described movement. Thus, "migration ... at any time" is no more gradual than "migration" unmodified. Consequently, we conclude, in accord with *Lititz II,* that the inconsistency in meaning created by reference to migration "simply indicates, ... that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous." *Lititz II,* 785 A.2d at 981. Such a clause cannot be the basis for an exclusion from coverage under a policy of insurance. *See id.*

¶ 13 We conclude accordingly, that Northside's claim for defense and indemnity does not fall within the scope of the pollution exclusion clause in Northwestern's policy. Therefore, Northwestern remains bound by its obligation to defend and indemnify Northside on the claims raised by Donna Jeffrey in the underlying action. *See Madison Construction,* 735

A.2d at 106; *Britamco,* 636 A.2d at 651. We are thus compelled to conclude that the trial court erred in granting Northwestern's demurrer. *See Ham,* 620 A.2d at 9.

¶ 14 Because we find dispositive the challenge raised by Northside in its first question on appeal, we shall not address Northside's remaining question. Additionally, we express no opinion concerning Northside's assertion that our remand order "should allow the trial court to consider all of [Northwestern's] policy defenses and create a full record on them." Development of a record on remand is subject to application of the Rules of Civil Procedure as interpreted by the trial court.

¶ 15 For the foregoing reasons, we reverse the trial court's order sustaining Northwestern's demurrer.

¶ 16 Order **REVERSED.** Case **RE-MANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED.**