2015 VT 52

# Cincinnati Specialty Underwriters Insurance Company v. Energy Wise Homes, Inc., Shirley A. Uhler, Michael D. Uhler and Poulos Insurance, Inc.

[120 A.3d 1160]

No. 14-165

Present: Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

Opinion Filed April 3, 2015

*Shapleigh Smith, Jr.* and *Sophie E. Zdatny* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Plaintiff-Appellant.

*Joel P. Iannuzzi* of *Cleary Shahi & Aicher, P.C.*, Rutland, and *Jennifer Deck Samuelson* (On the Brief) of *Samuelson Law Offices*, Manchester Center, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Insurer Cincinnati Specialty Underwriters Insurance Company appeals from the trial court's order granting summary judgment to defendants Energy Wise, Inc. and Michael D. and Shirley A. Uhler in this declaratory-judgment action. It argues that the court should have granted summary judgment in its favor because the "total pollution exclusion" in its policy plainly and unambiguously precludes coverage in this case. We agree with insurer, and therefore reverse the trial court's decision and remand with instructions to enter judgment in insurer's favor.

¶ 2. The facts are undisputed. Energy Wise is a Vermont corporation that specializes in insulating buildings and homes. It purchased a commercial general liability (CGL) policy from insurer, effective March 1, 2010 to March 1, 2011. As insurer notes, this was a "surplus lines" policy.[1] See 8 V.S.A. § 5022(b)(8) (defining

---

[1] Vermont law provides that insurance coverage "shall not be placed with a non-admitted insurer unless the full amount of insurance required is not reasonably procurable from admitted insurers actually transacting that kind and class of insurance in [Vermont]; and the amount of insurance exported shall be only the excess over the amount procurable from admitted insurers actually transacting and insuring that kind and class of insurance." 8 V.S.A. § 5024(a); see also *DeBartolo v. Underwriters at Lloyd's of London*, 2007 VT 31, ¶ 3, 181 Vt. 609, 925 A.2d 1018 (mem.) (recognizing that a surplus lines insurer "can issue coverage only if it is not reasonably available from other sources"). According to insurer, the terms of a surplus lines policy are not subject to approval by the State of Vermont, citing 8 V.S.A. § 5021 et seq. Defendants do not argue otherwise.

This is significant because the Vermont Department of Financial Regulation requires all insurers issuing liability policies in Vermont to *provide* coverage for pollution by endorsement, although the Department will consider a "Consent to Rate" application "from licensed insurance companies or their agents seeking to attach a pollution exclusion to liability coverage when there is a high probability of a pollution claim." See Insurance Bulletin No. 111 (Oct. 18, 1996), available at http://www.dfr.vermont.gov/reg-bul-ord/pollution-coverage.

Vermont regulators have disapproved of such exclusions since their inception based on a "determination that the exclusions were 'unfair and discriminatory to

"surplus lines insurance" as "coverage not procurable from admitted insurers"); *id.* § 5022(b)(1) (defining "admitted insurer" as "an insurer possessing a certificate of authority to transact business in [Vermont] issued by the Commissioner [of Financial Regulation] pursuant to [8 V.S.A. § 3361]").

¶ 3. In late 2010, Energy Wise installed spray-foam insulation at the Shrewsbury Mountain School. A school employee, Shirley Uhler, and her husband later filed suit against Energy Wise. Ms. Uhler asserted that she was "exposed to and encountered airborne chemicals and airborne residues" from the spray-foam insulation and suffered bodily injury as a result.[2] The Uhlers raised claims of negligence, res ipsa loquitur, and loss of consortium. Energy Wise requested coverage under its CGL policy, and insurer agreed to defend Energy Wise under a bilateral reservation of rights.

¶ 4. In September 2012, insurer filed a complaint for declaratory judgment, asserting that its policy did not cover the claims at issue. Insurer cited the "Total Pollution Exclusion Endorsement" in its policy, which excluded coverage for "[b]odily injury . . . [that] would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

¶ 5. The policy defined "pollutants" as:

> any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to, that which has been recognized in industry or government to be harmful or toxic to per-

---

some[,] and indeed most[,] risks' and inconsistent with the 'public expectation of the level of coverage or the degree of coverage that is supposed to be available when one purchased a general liability policy. . . . That practice continues today, although VDBI [(now DFR)] now has a mechanism for approving pollution exclusions on a risk-by-risk basis in cases where, for example, the insured's operations involve a particularly high risk of environmental liability and the insured would otherwise be unable to obtain coverage." *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 80 (2d Cir. 1999) (alteration omitted).

[2] While the Uhlers' complaint did not specifically identify the airborne substance allegedly responsible for Ms. Uhler's injury, the Uhlers' expert opined that it was most likely tertiary amine catalysts.

sons, property or the environment, regardless of whether the injury, damage, or contamination is caused directly or indirectly by the "pollutants" and regardless of whether: (a) The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or (b) The insured uses, generates or produces the "pollutant."

The following specific pollutants were expressly excluded: respirable dust, microorganisms, fungi, bacteria, sulfuric acid, tainted drywall, chromated copper aresante, fluorine, beryllium, benzene, formaldehyde, and manganese.

¶ 6. The policy also excluded coverage for "bodily injury" arising out of "the installation or application of any exterior insulation and finish system or any substantially similar system, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such system." (Quotation marks omitted.)

¶ 7. Insurer argued that given the broad language used in the exclusion, and the fact that the policy included additional exclusions for actual or alleged bodily injury arising out of or caused by other potential toxins, it was clear that the policy "d[id] not provide any coverage for bodily injuries related to toxins, chemicals, or pollutants." Thus, insurer argued, the Uhlers' underlying claim, which was based on exposure to toxic "airborne chemicals" and "airborne residues," was not covered.

¶ 8. The Uhlers opposed insurer's motion for summary judgment. They argued that the pollution exclusion was intended only to protect against liability for traditional environmental hazards, and that insurer's interpretation was so overbroad as to make the policy meaningless.

¶ 9. In a January 2014 decision, the court indicated its intent to grant summary judgment to defendants. It recognized that many other courts had interpreted total pollution exclusions like the one at issue, and it identified two cases that helped frame the debate: *MacKinnon v. Truck Insurance Exchange*, 73 P.3d 1205 (Cal. 2003), and *Quadrant Corp. v. American States Insurance Co.*, 110 P.3d 733 (Wash. 2005). California holds that the total pollution exclusion is limited "to injuries arising from events commonly thought of as pollution, i.e. environmental pollution," and it is not intended to encompass "ordinary acts of negligence involving harmful substances." *MacKinnon*, 73 P.3d at 1216. Washington, on

the other hand, holds that the total pollution exclusion, by its plain language, excludes all injuries that occur from pollutants. *Quadrant Corp.*, 110 P.3d at 735.

¶ 10. After considering these and other cases, the court found *MacKinnon* persuasive. It concluded that the purpose of the total pollution exclusion was and remained to protect insurers against traditional environmental liabilities. As applied to the facts here, the court found the term "pollutants" ambiguous because it was capable of such broad interpretation as to frustrate any reasonable purpose of the policy. It found that insurer's definition admitted to no limiting principle that would provide a business such as Energy Wise with any assurance that any aspect of its business operations would be covered.

¶ 11. The court found that a similar ambiguity afflicted insurer's broad definition of the term "discharge." Energy Wise sprayed insulation into buildings as the fundamental aspect of its business operations. It did not spray the insulation into the air, water, or earth in a way that was consistent with traditional environmental liability. Under insurer's argument, the court reasoned, almost any use of the products of Energy Wise's business that harmed a third party might be excluded. Seen in this light, the court concluded that the term "discharge" was ambiguous and insurer could not rely on the exclusion to relieve it of its duty to defend and indemnify Energy Wise.

¶ 12. The court disagreed with the reasoning of the Washington Supreme Court, finding its resort to plain-language analysis facile. It concluded that the Washington decision did not sufficiently account for the historical purpose and development of the pollution exclusion, or for the reasonable expectations of an insured business that the pollution exclusion should be subject to a limiting principle that preserved the meaning and value in a CGL policy. The court considered insurer's argument an " 'opportunistic afterthought' inimical to the expectations of coverage reasonably associated with the sale of a [CGL] policy to a company engaged in the business of spraying insulation." (Quoting *Quadrant Corp.*, 110 P.3d at 748 (Chambers, J., dissenting)).

¶ 13. Thus, given the ambiguities in the policy, and the rule that all ambiguities must be read in favor of the insured, *Vt. Mut. Ins. Co. v. Parsons Hill P'ship*, 2010 VT 44, ¶ 21, 188 Vt. 80, 1 A.3d 1016, the trial court rejected insurer's argument that coverage was excluded. The court indicated that it would enter summary

judgment in defendants' favor absent a persuasive demonstration that such relief was unwarranted. Insurer submitted a response, which the court found unpersuasive. This appeal followed.

¶ 14. Insurer argues on appeal that its policy plainly bars coverage. According to insurer, its policy goes beyond excluding coverage for traditional environmental risks because its definition of "pollutants" includes "that which has been recognized in industry or government to be harmful or toxic to *persons, property* or the environment." (Emphasis added and quotation marks omitted.) Insurer asserts that this language broadens the scope of the pollution exemption beyond traditional environmental claims and distinguishes this case from the cases relied upon by the trial court. Insurer maintains that it is entitled to have the policy enforced as written, that the reasonable expectations doctrine is irrelevant given the plain language of the policy, and that enforcement of the exclusion does not render coverage illusory.

¶ 15. We review the trial court's decision "de novo, applying the same standard as the trial court." *Progressive Cas. Ins. Co. v. MMG Ins. Co.*, 2014 VT 70, ¶ 10, 197 Vt. 253, 103 A.3d 899. "Summary judgment is appropriate if the material facts are undisputed and any party is entitled to judgment as a matter of law." *Id.*; see also V.R.C.P. 56.

¶ 16. ▇▇▇ We apply well-established legal principles to this dispute. An insurance policy is construed according to "its terms and the evident intent of the parties as expressed in the policy language." *Sperling v. Allstate Indem. Co.*, 2007 VT 126, ¶ 8, 182 Vt. 521, 944 A.2d 210 (quotation omitted). We interpret policy terms "according to their plain, ordinary and popular meaning." *Id.* (quotation omitted). Ambiguity exists "[i]f a term is subject to more than one reasonable interpretation," and all ambiguities "must be resolved in favor of the insured." *Id.* (quotation omitted). Policies that "specifically and unambiguously exclude coverage are effective to preclude the insurer's liability," and "we cannot deny the insurer the benefit of unambiguous provisions inserted into the policy for its benefit." *Id.* ¶ 14 (quotation omitted). While we are mindful of "the reasonable expectation of the insured in interpreting insurance coverage policy provisions," "apart from circumstances where an agent of the insurance carrier promises specific coverage, we have not held that the expectations of an insured can control over unambiguous policy language." *Parsons Hill*, 2010 VT 44, ¶ 28.

¶ 17. We begin with the "well-documented and relatively uncontroverted" events that led to the insurance industry's adoption of the pollution exclusion. *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 79 (Ill. 1997) (quotation omitted). "Pollution exclusions originated from insurers' efforts to avoid sweeping liability for long-term release of hazardous waste." *Quadrant*, 110 P.3d at 737. "Prior to 1966, the standard-form CGL policy provided coverage for bodily injury or property damage caused by an 'accident.'" *Koloms*, 687 N.E.2d at 79 (quotation omitted). The term "accident" was not defined and courts frequently interpreted the term "to encompass pollution-related injuries." *Id.* The insurance industry changed to an "occurrence"-based policy, but courts continued to construe the policies "to cover damages resulting from long-term, gradual exposure to environmental pollution." *Id.* at 79-80.

¶ 18. Meanwhile, changes in federal environmental protection laws and a series of high-profile environmental disasters "imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies." *Id.* at 80. Following these events, the insurance industry drafted what eventually became the pollution exclusion. *Id.*

¶ 19. In 1970, an endorsement to the standard-form CGL policy provided in relevant part that:

> [This policy shall not apply to bodily injury or property damage] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*Id.* (alteration in original) (quotation omitted). "[I]n 1973, the insurance industry incorporated [this] endorsement directly into the body of the policy as exclusion 'f.'" *Id.* This exclusion is referred to as the total pollution exclusion.

¶ 20. Over "the next 13 years, various courts labored over the exact meaning of the words 'sudden and accidental.'" *Id.* "Not surprisingly, insurance companies responded by drafting a new version of the exclusion, which, first appearing in 1985, is now commonly known as the 'absolute pollution exclusion.'" *Id.* at 81. As one court explained:

The two most notable features of this latest version are (i) the lack of any exception for the "sudden and accidental" release of pollution, and (ii) the elimination of the requirement that the pollution be discharged "into or upon land, the atmosphere or any watercourse or body of water." Significantly, the purpose of the current exclusion, like its predecessor, is "to exclude governmental clean up costs from the scope of coverage."

*Id.* (alteration omitted).

¶ 21. Many courts have considered this historical background significant in deciding the circumstances under which the exclusion should bar coverage. In *Koloms*, for example, the court held:

Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation. Similarly, the 1986 amendment to the exclusion was wrought, not to broaden the provision's scope beyond its original purpose of excluding coverage for environmental pollution, but rather to remove the sudden and accidental exception to coverage which, as noted above, resulted in a costly onslaught of litigation. We would be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its *raison d'etre*, and apply it to situations which do not remotely resemble traditional environmental contamination. The pollution exclusion has been, and should continue to be, the appropriate means of avoiding the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*

*Id.* (citation and quotations omitted). The *Koloms* court found "it improper to extend the exclusion beyond that arena." *Id.* Thus, it held that the accidental release of carbon monoxide due to a broken furnace did not constitute the type of environmental pollution contemplated by the exclusion. *Id.* at 82.

¶ 22. Other courts have found the historical background of this exclusion less significant. The *Quadrant* court held that it could not look to the drafting history to *find* the exclusion ambiguous;

the drafting history was relevant only in determining a reasonable construction *after* the court had found an ambiguity. 110 P.3d at 738, 742. In *Quadrant,* the insured sought coverage for injuries suffered by a tenant when fumes from a waterproofing material entered the tenant's unit. The court concluded that the absolute pollution exclusion "unambiguously applies to the facts of the case at hand," and that "the plain language must be applied without reference to extrinsic evidence regarding the intent of the parties." *Id.* at 742. "Where the exclusion specifically includes releases or discharges occurring on the owner's property," the court continued, "or as the result of materials brought onto the property at the behest of the insured, and a reasonable person would recognize the offending substance as a pollutant, the policy is subject to only one reasonable interpretation and the exclusion must not be limited." *Id.* at 743.

¶ 23. As noted, insurer here argues that its pollution exclusion is even broader than the "absolute" or "total" pollution exclusion. At least one court has credited this argument. See *Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 635 N.W.2d 112, 118-21 (Neb. 2001) (concluding that, where definition of "pollutant" included substances that were "harmful or toxic to persons, property or the environment," the inclusion of "the environment" as a separate entity that could suffer harm from a pollutant demonstrated that pollution exclusion's scope was not limited to environmental pollution); see also *Clipper Mill Fed., LLC v. Cincinnati Ins. Co.,* No. JFM-10-1647, 2010 WL 4117273, at *7 (D. Md. Oct. 20, 2010) (unpub.) (reaching similar conclusion). But cf. *Belt Painting Corp. v. TIG Ins. Co.,* 795 N.E.2d 15, 20-21 (N.Y. 2003) (rejecting argument that omission of requirement that pollutants be discharged or dispersed "into or upon land, the atmosphere or any water course or body of water" indicated intent to extend exclusion to indoor, as well as outdoor, pollution, and explaining that omission of such language merely removed redundancy, as "any pollution will necessarily involve discharge or release into land, atmosphere or water" and omission of such language did not overcome environmental implications of terms "discharge, dispersal, seepage, migration, release or escape").

¶ 24. We recognize that courts are split on the question of whether the absolute pollution exclusion bars coverage for all injuries caused by pollutants or whether the exclusion applies only to injuries caused by traditional environmental pollution. Compare

*Becker Warehouse*, 635 N.W.2d at 118 (recognizing split and concluding that "[a] majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants" (citing cases)), and *Quadrant*, 110 P.3d at 738 (finding that "a majority of courts has concluded that absolute pollution exclusions unambiguously exclude coverage for damages caused by the release of toxic fumes" (citing cases)) with *MacKinnon*, 73 P.3d at 1209 n.2 (concluding that, "[c]onsidering those jurisdictions that have taken a definitive position, as represented by a published opinion of the state supreme court, the narrower interpretations of the pollution exclusion appears to be in the majority" (citing cases)), and *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 635, 635 n.2 (Minn. 2013) (concluding that "a majority of jurisdictions limit the [pollution] exclusion to situations involving traditional environmental pollution," although it is a slim majority (citing cases)). As the *MacKinnon* court emphasized, and as is evident from the case law, "[t]o say there is a lack of unanimity as to how the clause should be interpreted is an understatement." 73 P.3d at 1208; see also *Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 800 (Ala. 2002) ("[T]here exists not just a split of authority, but an absolute fragmentation of authority."). We need not address the question of whether the "absolute exclusion" set forth above would exclude the risk at issue here.

¶ 25. ▮ The policy here excludes coverage for "[b]odily injury . . . [that] would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." The term "pollutants" includes gaseous irritants or contaminants, including chemicals, vapor, and fumes. It encompasses "that which has been recognized in industry or government to be harmful or toxic to persons, property or the environment, regardless of whether . . . the insured uses, generates or produces the 'pollutant.'"

¶ 26. The Uhlers claimed in their complaint that Ms. Uhler suffered bodily injury after being exposed to and encountering "airborne chemicals and airborne residue." They alleged that, as part of its work at the school, Energy Wise "would be using products and materials that were known to be severely toxic with significant risk of injury and/or illness to humans who may be exposed to them." There appears to be no dispute that the

airborne chemicals and residues at issue "ha[ve] been recognized in industry or government to be harmful or toxic to persons, property or the environment." Insurer cites numerous authorities in support of this contention, and defendants do not argue otherwise. These toxic chemicals allegedly became airborne, and were inhaled, as a result of Energy Wise's application of spray-foam insulation. This represents a "dispersal" or "release" of such chemicals under a common-sense reading of those terms. See *Becker Warehouse*, 635 N.W.2d at 122 (similarly concluding that where fumes from floor sealant allegedly contaminated food stored in warehouse, "the only logical explanation for the alleged damage is that the . . . fumes 'discharged, dispersed, released or escaped' " from their original location to the place where the food was stored). But see *Belt Painting Corp.*, 795 N.E.2d at 20 (reaching opposite conclusion, and holding that terms such as "discharge" and "dispersal" are "terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste," and agreeing that "it strains the plain meaning, and obvious intent, of the language to suggest that . . . fumes, as they went from the container to [the injured party's] lungs, had somehow been discharged, dispersed, released or escaped" (alteration in original) (quotations omitted)).

¶ 27. ██ ██ We recognize that the "broad nature of the pollution exclusion may cause a commercial client to question the value of portions of its commercial general liability policy." *Becker Warehouse*, 635 N.W.2d at 120. Our role on review, however, is not to rewrite the policy. Where, as here, the language used "is clear and susceptible of only one possible interpretation," it must be enforced as written. *Id.* at 120-21; see also *Sperling*, 2007 VT 126, ¶ 14 (stating that, where policy "specifically and unambiguously exclude[s] coverage," exclusion is "effective to preclude the insurer's liability" (quotation omitted)). This interpretation does not render the policy illusory. As insurer points out, the policy does provide coverage for other liability risks, such as slip-and-fall injuries. See also *Quadrant*, 110 P.3d at 744 (rejecting argument that pollution exclusion rendered CGL policy illusory, explaining that although policy excluded from coverage some claims that would arise out of typical type of work conducted by insured, it did not preclude coverage for many accidents that could otherwise occur, such as slip-and-fall injuries). That the policy does not cover the type of claims that one might reasonably expect to arise in

the course of Energy Wise's business does not render the policy unenforceable. As indicated above, an insured's "reasonable expectations" cannot trump "unambiguous policy language." *Parsons Hill*, 2010 VT 44, ¶ 28; see also *Wolters*, 831 N.W.2d at 638-39 & 639 n.4 (reaching similar conclusion, and stating that "[t]he reasonable expectation test is not a license to ignore the pollution exclusion . . . nor to rewrite the exclusion solely to conform to a result that the insured might prefer").

¶ 28. ■ Finally, we note the limited nature of our holding. As indicated above, the Vermont Department of Financial Regulation requires all insurers issuing liability policies in Vermont to *provide* coverage for pollution by endorsement unless the Department approves a "Consent to Rate" application. Thus, our decision today applies only to surplus lines insurers.

*Reversed and remanded.*

¶ 29. **Morris, Supr. J.** (Ret.), Specially Assigned, dissenting. Energy Wise bought a general commercial liability policy for its insulation business. As the majority interprets the policy's pollution exclusion, Energy Wise essentially purchased nothing. Under the plain-language construction adopted by the majority, Energy Wise is not covered for any injury or damage connected to the compounds used in its insulation business. The majority's construction is not, however, the only reasonable interpretation of the pollution exclusion. An insured purchasing this policy could have reasonably understood the terms "discharge" and "pollutant" in the exclusion as limited to the mechanisms and substances involved in traditional pollution and not excluding injury caused by ordinary negligence in the course of business. Given that more than one interpretation of the terms is reasonable, the policy is ambiguous. I would resolve this ambiguity in favor of the insured and affirm.

¶ 30. As explained by the majority, the facts are undisputed. Defendant Energy Wise is a company that insulates buildings. It purchased a general liability policy from plaintiff. In late fall 2010, Energy Wise contracted to install spray insulation at a Rutland-area school. One of the employees of the school, Shirley Uhler, alleged she suffered respiratory illness and other medical injuries as a result of the spray insulation. Shirley and her husband Michael sued Energy Wise, claiming that she was exposed to chemicals and airborne residue from the application. She asserted,

among other things, that Energy Wise failed to exercise due care and perform in a workmanlike manner. Insurer filed this suit seeking a declaration that it has no duty to defend or indemnify defendant Energy Wise in the personal-injury suit.

¶ 31. Insurer filed for summary judgment, claiming that under the plain language of the policy's "Total Pollution Exclusion" the alleged injury was excluded because the policy did not provide "*any* coverage for bodily injuries related to toxins, chemicals, or pollutants." The court concluded that the language of the exclusion was ambiguous because the terms pollutant and discharge were capable of such broad interpretations as to render them meaningless. The court further noted that the purpose of the pollution exclusion was to protect against traditional environmental liabilities, and not ordinary negligence. The court resolved the ambiguity in favor of the insured, denied insurer summary judgment, and granted judgment for insured.

¶ 32. The trial court properly determined that the policy in this case is ambiguous because the policy terms do not have a clear meaning. Insurer has not met its burden of demonstrating that the claims fall within the exclusion for two main reasons. First, it is not evident that the process that caused the injury in this case — spraying foam insulation into a building — resulted from one of the actions identified in the policy exclusion — discharge, dispersal, seepage, migration, release or escape — or that this action was the "but-for" cause of the injury. Second, there is insufficient evidence to show that the injury was caused by a pollutant, or that pollutant as used in the policy covers the work performed by Energy Wise.

¶ 33. The legal framework is important. Insurer sought a declaration here that it was not obligated to indemnify or defend insured. The duty to indemnify arises when there is a loss or injury that falls within the coverage provisions and is not removed from coverage by an exclusion. *Coop. Ins. Cos. v. Woodward*, 2012 VT 22, ¶ 11, 191 Vt. 348, 45 A.3d 89. The duty to defend is broader than the duty to indemnify. *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994). To determine if the duty to defend arises, the allegations in the complaint are compared to the terms of coverage in the policy. *Id.* "If any claims are potentially covered by the policy, the insurer has a duty to defend." *Id.*

¶ 34. To determine the scope of coverage, the insurance contract is interpreted using familiar standards. An insurance contract is construed first by looking to the terms used and " 'the evident intent of the parties as expressed in the policy language.' " *N. Sec. Ins. Co. v. Perron*, 172 Vt. 204, 209, 777 A.2d 151, 154 (2001) (quoting *Nat'l Union Fire Ins. Co.*, 163 Vt. at 127-28, 655 A.2d at 721). The terms of a contract are given their "plain, ordinary and popular meanings." *Waters v. Concord Grp. Ins. Cos.*, 169 Vt. 534, 536, 725 A.2d 923, 926 (1999) (mem.). An ambiguity in the policy arises when "a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Id.* at 537, 725 A.2d at 927 (quotation omitted). The overall "guiding principle" in interpreting an insurance contract is to consider "what a reasonably prudent person applying for insurance coverage would have understood [the terms of the contract] to mean. *Coop. Ins. Cos.*, 2012 VT 22, ¶ 9 (quotation omitted).

¶ 35. Therefore, the language of the policy itself is the starting point for determining whether coverage exists. This was a commercial general liability policy for the business described therein as "insulation contractors." The policy covered bodily injury and property damage caused by an occurrence. It is clear that in the absence of an exclusion the injury alleged by plaintiffs would have been covered under this policy.

¶ 36. Thus, the main question is whether an exclusion from coverage applies. "The insurer bears the burden of showing that the claims are excluded by the policy." *Perron*, 172 Vt. at 209, 777 A.2d at 154. Here, insurer relies on the policy exclusion entitled "Total Pollution Exclusion Endorsement." The exclusion exempts coverage for bodily injury and property damage "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." Pollutant is defined separately as:

> any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include

but are not limited to, that which has been recognized in industry or government to be harmful or toxic to persons, property or the environment, regardless of whether the injury, damage, or contamination is caused directly or indirectly by the "pollutants" and regardless of whether: (a) The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or (b) The insured uses, generates or produces the "pollutant."

Thus, insurer bore the burden of proving both that the airborne compounds and particulates from the spray-foam insulation were pollutants when deployed to insulate the building, and that the injury would not have occurred but for the discharge, dispersal, seepage, migration, release or escape of those compounds.

¶ 37. Of course, this question does not reach this Court in a vacuum. As the majority recounts, pollution exclusions have been the subject of intense litigation for many years, and there is no consensus on the proper interpretation of these clauses. See *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1208 (Cal. 2003) ("To say there is a lack of unanimity as to how the clause should be interpreted is an understatement."). Some of the difference in outcomes is due to variations in fact patterns and some to changes in the language of the pollution exclusion as it has evolved over the years. It began as a qualified exclusion for the "sudden and accidental" release of pollutants. See *Pa. Nat'l Mut. Ins. Co. v. City of Pittsburg*, 987 F.2d 1516, 1518-19 (10th Cir. 1993) (analyzing whether injury resulted from "sudden and accidental" discharge). The next version, referred to as the absolute pollution exclusion, eliminated the "sudden and accidental" language and the requirement that the pollutant be discharged into the land, atmosphere or water. *MacKinnon*, 73 P.3d at 1209-10 (describing history of pollution exclusion). The third generation, and the one at issue here, is referred to as the total pollution exclusion, and excludes coverage for damage that "would not have occurred in whole or in part *but for* the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Emphasis added.)

¶ 38. Several courts have concluded that these exclusions, including the total pollution exclusion, are ambiguous and do not exclude coverage for all injuries related to toxic substances. See, e.g., *Builders Mut. Ins. Co. v. Parallel Design & Dev. LLC*, 785

F. Supp. 2d 535, 547-48 (E.D. Va. 2011) (concluding total pollution exclusion ambiguous); *Kerr-McGee Corp. v. Ga. Cas. & Sur. Co.*, 568 S.E.2d 484, 487 (Ga. Ct. App. 2002) (same). Such determinations generally focus on three things. First, the terms "discharge, dispersal, release or escape" all imply "expulsion of the pollutant over a considerable area rather than a localized toxic accident occurring in the vicinity of intended use." *MacKinnon*, 73 P.3d at 1211; see 9 S. Plitt et al., Couch on Insurance § 127:9 (3d ed. 2014) (citing cases holding that exclusion "does not apply if the facts show that the discharge, dispersal, release, or escape was a localized toxic accident occurring within the vicinity of the pollutant's intended use"). Second, the word pollutant when defined as a contaminant or irritant is overly broad and therefore ambiguous. *MacKinnon*, 73 P.3d at 1211. Third, the history of the exclusion reveals that it was intended to remove coverage for traditional environmental contamination, and not for ordinary negligence. *Id.* at 1211-12.

¶ 39. Other jurisdictions have read the language of the pollution exclusion to unambiguously exclude coverage. See, e.g., *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 741 (Wash. 2005) (concluding that policy language clearly excluded coverage for injury suffered by tenant caused by fumes from waterproofing material). The majority takes this approach, concluding that the exclusion here unambiguously bars coverage because the injury resulted from exposure to a chemical and those chemicals were airborne. As explained more fully below, this conclusion oversimplifies the situation. A reasonably intelligent layperson viewing the language in light of the usual and natural meaning of the words and the existing circumstances could justifiably read the exclusion in this case as limiting coverage for harm caused by traditional environmental pollution, and not excluding coverage for injuries arising from ordinary negligence while using a product for its intended purpose. As applied to the facts here, the insurer has failed to demonstrate that the exclusion applies because it fails to show that the injury was caused by a pollutant and that the injury would not have occurred but for the discharge of that pollutant.

### I. Discharge

¶ 40. Looking first to the mechanism of injury, it is totally unclear that the injury here was due to a discharge, dispersal,

seepage, migration, release or escape of a substance. Insurer gives little argument on this point, stating simply in a footnote that there is no dispute that the chemicals and residue at issue here were dispersed, released or escaped into the air. The majority also provides only limited consideration of this question, stating simply that when Energy Wise applied the spray insulation, toxic chemicals became airborne and were therefore dispersed or released "under a common-sense reading of those terms." *Ante,* ¶ 26.

¶ 41. While one reasonable interpretation of the policy is that it includes any injury that arises when a substance becomes airborne, that is certainly not the only interpretation. It is important to emphasize that "ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." 2 S. Plitt, *supra,* § 21:14. It is wholly reasonable for an ordinary person seeking coverage to interpret the terms "discharge, dispersal, release or escape" as environmental terms of art and referring to mechanism by which pollution escapes from a contained space into the surrounding area. See *Mistick, Inc. v. Nu. Nat'l Cas. Co.,* 2002 PA Super 267, ¶¶ 9-10, 806 A.2d 39 (explaining that "dispersal" is ambiguous because it connotes environmental context of gradual movement). Further, it is reasonable to conclude that these terms do not apply to injuries resulting from exposure to an airborne irritant in the area of its intended use. *Belt Painting Corp. v. TIG Ins. Co.,* 795 N.E.2d 15, 20 (N.Y. 2003) (concluding that terms "discharge" and "dispersal" in total pollution exclusion were ambiguous and did "not clearly and unequivocally exclude a personal injury claim arising from indoor exposure to plaintiff insured's tools of its trade").

¶ 42. Particularly where insurance is for a business involving the regular use of chemical compounds, an exclusion referring to "discharge, dispersal, seepage, migration, release or escape" is ambiguous because it does not clearly define at what point the deployment of the chemical compound triggers the exclusion. As another court stated in finding this phrase ambiguous:

> Industrial chemicals when used as intended and released from a container may be used in a production process to etch, to strip, to clean, to degrease, to polish, to act as a solvent, to paint, to coat, to act as a mastic, or to surface. At what point in time does a "discharge, dispersal, seep-

age, migration, release or escape" of industrial chemicals outside a container or containment system occur? How would containment be defined, i.e., used as intended outside a container, contained within the plant, or merely outside its container? For example, carbon tetrachloride, reported in many cases of maintenance slip and fall cases as a common industrial solvent/degreaser, when used on the floor of a restaurant or fast food business to remove food spills, would come within [insurer's] overly broad exclusion language if it caused someone to slip and fall. This definition of the escape of pollutants is overly broad and demonstrates ambiguity that would cause a reasonable person to be unsure of what is excluded and what is covered by insurance.

*Kerr-McGee Corp.*, 568 S.E.2d at 485-86. Given that there is no allegation in this case that the spray-foam insulation traveled outside of the area of its intended use, there is an ambiguity as to whether there was a "discharge, dispersal, seepage, migration, release or escape" of this substance.

¶ 43. A similar conclusion was reached by the U.S. Court of Appeals for the Sixth Circuit in a case involving a painting company that was hired to perform construction work, including painting and drywall sealing in a school. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178 (6th Cir. 1999) (applying Michigan law). A teacher alleged that fumes from the chemicals in a floor sealant caused respiratory injuries. The insurer denied coverage under a pollution exclusion. The court concluded that the exclusion did not apply because the alleged injury was confined to the general area of the intended use and therefore the injury was not caused by the "discharge, dispersal, seepage, migration, release or escape of pollutants." *Id.* at 1184-85 (quotation marks omitted). The court explained that the policy language did not "clearly and unambiguously exclude coverage for such injuries." *Id.* at 1185. The same is true here. The policy terms "discharge, dispersal, seepage, migration, release or escape" do not unambiguously apply to the release of substances confined to the general area of their intended use. See *Roofers' Joint Training, Apprentice & Educ. Comm. of W. N.Y. v. Gen. Accident Ins. Co. of Am.*, 713 N.Y.S.2d 615, 617 (App. Div. 2000) (holding that there was no discharge, dispersal, release, or escape of pollutants where fumes that caused injury were part of normal roofing process and confined to area of intended use).

¶ 44. Further, insurer has failed to demonstrate that even if there was a discharge, this discharge was the "but-for" cause of the injury. The complaint alleges that the school employee was injured when she inhaled chemicals or particles used in the insulation process. Employee asserts that her exposure was the result of Energy Wise's negligence in failing to perform in a workmanlike manner and to properly warn or secure the site. In other words, the chemicals were not the cause of injury; rather, the "but-for" cause of the injury was the negligence of employees in failing either to properly secure or ventilate their work area or warn employees as to when the space was ready for occupancy. See *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 696 S.E.2d 326, 332 (Ga. Ct. App. 2010) (concluding that pollution exclusion did not apply because allegations were that negligence of employees caused injury and not release of gas in itself). As the dissenting judge in *Quadrant* explained, "The mere fact that a pollutant was involved in the causal chain of events does not trigger the pollution exclusion." *Quadrant Corp.*, 110 P.3d at 745 (Chambers, J., dissenting). Because the exclusion can be reasonably read to apply only to injuries caused by a polluting event, it is ambiguous.

## II. Pollutant

¶ 45. To meet its burden, insurer was also required to first show that the injury was caused by a pollutant. Insurer has failed to meet this burden. The undisputed facts as presented to the trial court at summary judgment do not show that the chemicals or residues, which allegedly caused the injury, unambiguously meet the policy definition of pollutant. Further, the definition of pollutant in the policy is so broad as to make it ambiguous.

¶ 46. Here, the policy definition of pollutant includes irritants and contaminants that have been recognized by industry and government as harmful or toxic. Insurer posits that the spray-foam insulation alleged to have caused the injury is recognized by government as potentially hazardous, and therefore posits that the injury was unambiguously caused by a pollutant. The majority accepts insurer's position and concludes that the alleged injury was caused by the release of a pollutant because the airborne chemicals at issue " 'ha[ve] been recognized in industry or government to be harmful or toxic to persons, property or the environment.' " *Ante*, ¶ 26 (quoting policy definition of pollutant).

¶ 47. There is no evidence in the record to show that the chemicals or residues that caused the injury alleged are recognized by government as harmful or toxic. The complaint in the personal-injury action does not identify the chemicals or residues that caused Ms. Uhler's injury. Insurer's statement of undisputed facts in support of summary judgment did not attempt to set forth what particular compounds caused the injury. On appeal, insurer urges this Court to take judicial notice of the fact that spray-foam insulation has been recognized as harmful or toxic, and in support attaches an appendix of materials that was not part of the trial court record. Insurer specifically proffers that methylene diphenyl diisocyanate (MDI) is a compound found in spray-foam insulation and is identified by government as toxic because it is included by the Environmental Protection Agency (EPA) on its list of hazardous air pollutants. See 42 U.S.C. § 7412(b)(1). The majority does not specify what chemicals caused the injury or what industry or government standard it is relying upon, but simply repeats that the compounds at issue are recognized by government as toxic.

¶ 48. Insurer failed to demonstrate that the injury here was caused by a chemical that government or industry regards as toxic. The information submitted on appeal in support of this claim should be disregarded as not part of the record. See V.R.A.P. 10(a)(1) (defining record on appeal as documents filed in superior court). Further, even if this Court took judicial notice of these documents, MDI, on which insurer relies, is not identified as a component of the insulation used in this case or as a cause of the injury. The deposition submitted by insurer to the trial court in support of its motion to reconsider explains that spray-foam insulation can vary in its composition, and does not specify the composition of the insulation used here. In addition, to the extent that this Court accepts that MDI is a pollutant and a component of spray-foam insulation, the Uhlers did not allege that this was the source of the injury. In their opposition to summary judgment, the Uhlers stated that the injury was due to exposure to tertiary amine catalysts, and submitted an expert affidavit in support. Insurer has not demonstrated this compound is a pollutant. Since insurer has failed to unambiguously demonstrate that the injury alleged was caused by a pollutant, this Court should require insurer to defend. *City of Burlington*, 163 Vt. at 127, 655 A.2d at 721 (explaining that duty to defend arises if any claims potentially covered).

¶ 49. Even assuming that a compound in the insulation used by Energy Wise caused the injury and that the compound is on the EPA list of hazardous air pollutants, these facts alone do not make it a pollutant under the policy in all circumstances. This may be a reasonable interpretation, but it is not the only one. To assume that all listed chemical compounds are pollutants in all situations would result in overly inclusive and absurd situations since many of the compounds on the list of hazardous air pollutants have legitimate uses. For example, the EPA list identified by insurer includes chlorine, 42 U.S.C. § 7412(b)(1), a chemical used to disinfect drinking water, and found in tap water. If inclusion on the EPA list is enough to trigger the exclusion then any damage resulting from chlorine-treated water could be excluded. See *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) (explaining that terms "irritant" and "contaminant" if read broadly would exclude coverage "for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool" because both Drano and chlorine are irritants that can cause bodily injury). This is certainly not the only interpretation a reasonably prudent person applying for insurance coverage would have understood the terms of the contract to mean. See *Coop. Ins. Cos.*, 2012 VT 22, ¶ 9.

¶ 50. Insurer places great emphasis on the fact the definition of pollutant in this case differs from that used in other cases finding the language ambiguous, such as *MacKinnon*, 73 P.3d 1205. The definition of the policy here states that pollutants are not limited to substances that are generally recognized by industry or government to be harmful or toxic to persons, property or the environment, and insurer argues that this shows that the definition is intended to include contaminants that harm persons but not the environment. In other words, it unambiguously applies to injuries from toxic substances outside of traditional pollution. Other courts interpreting the same definition of pollutant have accepted this argument, concluding that it expands pollutant beyond traditional environmental pollutants. See *Clipper Mill Fed., LLC v. Cincinnati Ins. Co.*, No. JFM-10-1647, 2010 WL 4117273, at *7 (D. Md. Oct. 20, 2010) (concluding that definition of pollutant using phrase "harmful or toxic to persons, property or the environment" demonstrated intent to include irritants and

contaminants that harm persons but not environment, and expand scope beyond environmental pollution).

¶ 51. I cannot agree with the majority that this different language of pollutant makes the definition of pollutant unambiguous. The definition remains incredibly broad, applying to almost any injury involving a substance that could be harmful. The overly simplistic interpretation of the pollution exclusion applied by the majority means that it excludes coverage for ordinary negligence involving substances with toxicity. If so interpreted, then the exclusion has the potential to wholly eviscerate coverage. See *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 617 (Nev. 2014) (stating that definition of pollutant broad enough to include "items such as soap, shampoo, rubbing alcohol, and bleach" and therefore preclude coverage from accident caused by slipping on puddle of bleach or developing rash from soap). As Judge Posner explained:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property. Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.

*Pipefitters Welfare Educ. Fund*, 976 F.2d at 1043 (quotation omitted).

¶ 52. To apply the construction used by the majority would essentially eviscerate coverage for almost all imaginable injuries. Insurer counters, and the majority accepts, that the policy is not rendered illusory because it still provides coverage for risks such as slip-and-fall injuries. It is hard to imagine a scenario for this insured's business, however, that does not involve the dispersal of pollutants as the majority and insurer defined those terms. What if an employee tripped while discharging the spray-foam insulation? Under the majority's plain-language interpretation of pollutant and dispersal, any resulting injuries would be excluded. This is certainly not what a reasonable prospective insured would assume from reading the policy terms.

¶ 53. Ambiguity is also apparent when the definition of pollutant is viewed in the context of the policy as a whole. See *McAlister v. Vt. Prop. & Cas. Ins. Guar. Ass'n*, 2006 VT 85, ¶ 17, 180 Vt. 203, 908 A.2d 455 (explaining that policy provisions should be construed

as whole and policy viewed "in its entirety"). The policy contains individual exclusions for bodily injury and damage resulting from exposure to respirable dust, asbestos, lead, sulfuric gas, tainted drywall, chromated copper arsenate products, fluorine, beryllium, benzene, formaldehyde, and manganese. If the definition of pollutant is indeed as broad as insurer asserts, these additional exclusions and lists would be redundant because they would already fall within the pollution exclusion. See *Builders Mut. Ins. Co.*, 785 F. Supp. 2d at 547-48 (concluding definition of pollutant ambiguous in part due to terms of policy as whole). Therefore, given the lack of limiting language on the word pollutant and the inconsistencies that result with other provisions in the policy, I would conclude that pollutant as used in the exclusion is ambiguous.

## III. Resolving the Ambiguity

¶ 54. Generally, when an ambiguity arises, it is resolved by construing the policy in light of the parties' reasonable expectations, and any uncertainty is resolved in favor of the insured.[3] *Waters*, 169 Vt. at 537, 725 A.2d at 927. The reasonable expectations of the parties are important in considering the scope of insurance coverage "because such contracts, largely adhesive in nature, often contain boilerplate terms that are not bargained for, not read, and not understood by the insureds." *State Farm Mut. Auto. Ins. Co. v. Roberts*, 166 Vt. 452, 461, 697 A.2d 667, 672 (1997).

¶ 55. The purpose of this policy was to provide general liability insurance to Energy Wise for the insulation business. Undoubtedly, Energy Wise specifically contemplated that it would be insured for using spray-foam insulation since this is its business. See *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 791 (Ariz. Ct. App. 2000) (explaining that insured who purchases general liability policy "expects to be covered for ordinary negli-

---

[3] Here, the trial court denied summary judgment for the insurer, and entered judgment for the insured. I would affirm that decision. At the very least, however, this Court should remand for a factual inquiry into the proper scope of the exclusion "based on the common usages and understandings of the insurance industry, and the purposes of the exclusion in conjunction with the hazards and risks [insurer's] policy was designed to protect against." *Red Panther Chem. Co. v. Ins. Co. of Pa.*, 43 F.3d 514, 519 (10th Cir. 1994) (concluding total pollution exclusion ambiguous and remanding for inquiry into scope of policy exclusion).

gence in the course of its insured operations"). Given Energy Wise's reasonable expectation that it was purchasing a general liability policy, and the identified ambiguities in the policy, I would construe the policy in the insured's favor and affirm the trial court.