J-A03020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| STEVEN D. WEISS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| FRITCH, INC., BOSTON | : | No. 2332 EDA 2017 |
| ENVIRONMENTAL, L.L.C. | : | |

Appeal from the Order Entered May 1, 2017
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2016-C-1832

BEFORE:   GANTMAN, P.J., McLAUGHLIN, J., and PLATT*, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED APRIL 25, 2018**

Appellant Steven D. Weiss appeals from the orders of the trial court sustaining the Preliminary Objections that Appellee Boston Environmental, L.L.C. ("Boston") filed in response to Weiss's Second and Fifth Amended Complaints. The trial court held that Weiss's negligence claims against Boston in the Second Amended Complaint were precluded by the gist of the action doctrine, and that Weiss failed to allege sufficient facts in the Fifth Amended Complaint to support his claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").[1] We affirm.

---

*   Retired Senior Judge assigned to the Superior Court.

[1] **See** 73 P.S. §§ 201-1 through 201-9.3.

Weiss first brought suit against both Fritch, Inc. ("Fritch") and Boston in 2016. Weiss filed six complaints in total. Relevant to this appeal, Weiss filed a Second Amended Complaint, in which Weiss alleged that in 2003, he had a 275-gallon aboveground oil storage tank in the basement of his home. Fritch, the company which provided Weiss's oil deliveries, gave Weiss a pamphlet ("the Pamphlet") promoting the new "TankSure Program" (hereinafter "TankSure" or "the Program").

The Second Amended Complaint quoted portions of the Pamphlet, which explained that under the Program, Fritch would add a "corrosion protection product" to Weiss's oil; annually test the tank for corrosion using a special TankSure device; and warranty the payment of $1,000 toward a replacement tank if the annual inspection showed that replacement was proactively necessary. Second Amended Complaint at 39. Weiss also quoted portions of a "Tank Replacement Payment Certificate" ("the Certificate") he received, although he does not state in the Complaint when or how he received the Certificate. The Certificate further explained that the Program would provide "coverage for the tanks that leak due to corrosion or manufacturer's defects and for non-leaking tanks which are identified for proactive replacement by TankSure® Tank Analysis Software." *Id.* at 24.

Weiss alleged that Boston, a Delaware corporation, acted as the holder of the trademark of the TankSure Program, and that Boston promoted, marketed, advertised, and sold the Program to Weiss through Fritch. Weiss

quoted portions of the TankSure website and Facebook page, allegedly operated by Boston. Aside from making claims regarding the necessity and efficacy of the Program, the TankSure website stated that it is a "patent Data Collection, Data Tracking & Mining, and Sales & Marketing process." Second *Id.* at ¶ 118. On a portion directed towards "home comfort providers,"[2] the website explained the data-tracking portion of the Program as follows:

> The TankSure® Program fulfills all inspection requirements including record keeping and data tracing through the TankSure® Cloud Database. The ultrasonic thickness gauges used for the TankSure® Program inspections are specifically designed for testing home heating oil tanks.

*Id.* at ¶ 126.

> As inspection data is entered, The TankSure® Program allows you to access Equipment Sales Reports and data in real time from any web browser. . . . All data is hosted in a secure data hosting facility. This facility employs the use of biometric security access, 24/7 video surveillance, hospital grade back-up generators, fire suppression systems, and temperature humidity controls to ensure data integrity.

*Id.* at ¶ 120. The website also stated that the Program provides training for employees of home comfort providers, including in tank evaluation and data collection. *Id.* at ¶ 123.

Weiss signed up for the Program and received regular TankSure inspections, the most recent of which occurred in October 2013. According to Weiss, "[t]he results of the 10/23/13 Fritch [m]aintenance was that the [tank]

---

[2] Weiss asserts that Fritch is a "home comfort provider," and Fritch does not contest this categorization.

was sound and in conformity with the applicable standards, including the TankSure standard." *Id.* at ¶ 44.

Over a year after his last inspection, on December 1, 2014, Fritch refilled Weiss's tank with oil. Immediately following the Fritch employee's departure, the tank ruptured, spilling approximately 100 gallons of oil into Weiss's basement. Fritch removed the ruptured tank and installed a new tank. However, according to the Second Amended Complaint, Fritch did not use proper procedures when cleaning up the spill, causing further damage to Weiss's home and exposing Weiss to dangerous pollutants. Weiss had the replacement tank independently inspected, and it was found to be installed improperly. Fritch modified the tank and it passed an additional inspection.

Based on these facts, Weiss asserted, among other claims, a claim of negligence against Boston. According to Weiss, Fritch and Boston knew or should have known that Weiss's tank would be unable to withstand the final oil delivery, and were negligent in assuring him that his tank was sound. Weiss also claimed that he was misinformed about the integrity of his tank because both Fritch and Boston were negligent in designing and developing the TankSure Program, and in testing, inspecting, and analyzing his tank.

Boston filed Preliminary Objections in the nature of a demurrer pursuant to Pa.R.C.P. 1028(4), asserting that Weiss's Second Amended Complaint did not allege sufficient facts to sustain a negligence claim against Boston.

Weiss filed a Memorandum of Law in opposition to Boston's Preliminary Objections, and attached both the Pamphlet and Certificate as an exhibit. The Pamphlet displays Fritch's logo, address, and phone number, and states that the Program costs $55 per year. It makes the following claims regarding the function of the TankSure Program:

> Imagine the peace of mind you can have knowing that Fritch, Inc. has the ability to predict when your oil tank will fail, and be able to replace it prior to that time with up to $1000.00 of the replacement cost covered by the TankSure® Program.
>
> . . .
>
> The monitoring part of the program comes from an ultrasonic tank test that is conducted annually. By analyzing these measurements we are able to determine the integrity of your tank. If your tank is determined to be in need of replacement, while covered by this program, then the warranty part of the TankSure® Program will cover up to $1000.00 towards the replacement of the tank.

Memorandum of Law in Opposition to Preliminary Objections to Second Amended Complaint at Ex. A.

The Certificate displays a TankSure logo identical to the one in the Pamphlet, and explains in greater detail the parameters of the Program. It does not mention Fritch, but states that the Program is offered by the "Company," from which the homeowner must purchase all heating oil, and that the Company will provide $1,000 towards a replacement tank and its installation. *Id.* The Certificate states $1,000 towards a replacement tank is the exclusive remedy "for tanks that leak due to corrosion or manufacturer's defects and for non-leaking tanks which are identified for proactive preplacement by the TankSure® Analysis Software," or "for defects in the

tank caused by the manufacturer for any deficiency in the tank testing equipment, tank test procedures, visual inspection process, or test results." *Id.* It also mentions Boston, but only to state that Boston disclaims all "other liabilities" aside from $1,000 towards tank replacement, including costs associated with tank repair, clean-up costs, and property damage. *Id.*[3]

The court sustained the Preliminary Objections and dismissed the negligence claim against Fritch and Boston without prejudice. The court concluded that the claim was precluded by the "gist of the action" doctrine, which prevents a plaintiff from recasting a breach of contract claim as a tort claim. *See* Trial Court Opinion, filed Sept. 5, 2017, at 7-9.

Weiss filed a Fifth Amended Complaint, in which he asserted (among other counts), that the claims made on the TankSure website and Facebook

---

[3] The Certificate stated that Boston disclaims, "without limitation,"

> incidental, special, and consequential damages to Buyer, homeowner, or third parties; parts and labor associated with repair of the tank; costs associated with pumping out oil and otherwise clearing the tank as part of the replacement; damage to pipes to and from the tank; the replacement cost of any oil lost as a result of releases or otherwise; environmental liabilities and clean-up costs and all other costs arising from or related to discharges of oil or releases of contaminates from the tank or piping; costs associated with disposing of any oil contained in the tank; and all fines, penalties, and claims for property damage or diminution in property value, including those alleged or incurred by the homeowner or third-parties.

Memorandum of Law in Opposition to Preliminary Objections to Second Amended Complaint at Ex. A.

page (maintained by Boston) violated the UTPCPL.[4] Weiss repeated that he received the Pamphlet from Fritch in October 2003, and claimed that based on the statements in the Pamphlet and oral assurances from Fritch, he decided to enroll in the Program. Weiss also alleged, broadly, that "[f]rom 2003 to 2014," he accessed and read information on the TankSure website and Facebook page "in order to formulate the basis for acceptance [of] and annual renewal" in the Program. Fifth Amended Complaint at ¶¶ 26, 59.

The Fifth Amended Complaint again quoted portions of the TankSure website and Facebook page. According to the Fifth Amended Complaint, the website made claims regarding endorsements of the Program such as:

> The practice of ultrasonic testing is endorsed by insurance companies and State Environmental Protection Agencies[.]

*id.* at ¶ 36;

> Ultrasonic thickness gauges have been successfully utilized for nondestructive testing in a variety of industries and scenarios for over 30 years. Some of the larger primary industries currently utilizing ultrasonic are Oil & Gas, Aerospace, Aircraft, Power, Automotive, Structural Engineering, Military, Stamping, and Precision. A large number of industry segments are also utilizing this technology to fulfill their inspection requirements.

*id.* at ¶ 43;

---

[4] The UTPCPL provides a civil cause of action for any purchaser of a service, for personal or household purposes, who suffers a loss as a result of "a method, act, or practice declared unlawful by section 3 of this act[.]" 73 P.S § 201-9.2(a). Section 3 of the UTPCPL declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce" as defined by subsections 201-2(4)(i) through (xxi). *Id.* at § 201-3.

[T]he Environmental Protection Agency (EPA) and American Petroleum Institute (API) approve ultrasonic testing as a method for determining the integrity of fuel oil storage tanks. While these agencies do not currently regulate home heating oil tanks, rather they regulate larger commercial tanks, the methods they approve are directly applicable to home heating oil tanks. In fact, the applications are identical. The process that the TankSure® Program employs for ultrasonic testing is based on EPA and API standards and guidelines. The TankSure® Program fulfills all inspection requirements including record keeping and data tracking through the TankSure® Could Database. The ultrasonic thickness gauges used for the TankSure® Program inspections are specifically designed for testing home heating oil tanks.

*id.* at ¶ 44;

[T]he TankSure Program is the fuel oil industry's standard for evaluating the safety and integrity of aboveground oil tanks. The program utilizes a patented ultrasonic testing and review process to help identify when your tank should be replaced before it actually starts leaking.

*id.* at ¶ 46.[5]

Weiss claimed that the promotional materials he received from Boston, and from Boston through Fritch, constituted deceptive trade practices which violated portions of 73 P.S. § 201-2(4), "including, but not limited to" the following subsections:

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

_____

[5] Weiss also alleged that Boston, in response to this suit, has since removed "Homeowners" from the "Contact Us" portion of its website, indicating that the prior version of the website was directed towards Homeowners, rather than service providers. As this fact was not before the trial court, we cannot consider it.

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(iv) Using deceptive representations or designations of geographic origin in connection with goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have[.]

*Id.* at ¶ 226 (quoting 73 P.S. § 201-2(4)(ii-v)). Weiss claimed that these subsections apply to the manner in which Boston "sponsored and/or certified and/or represented and/or designated TankSure to [Weiss]"; "affiliated itself and/or associated itself and/or certified itself with Fritch in relation to [Weiss]"; and "affiliated TankSure and/or associated TankSure and/or certified TankSure with Fritch in relation to [Weiss]." *Id.* at ¶¶ 227-230.

Boston filed Preliminary Objections to the Fifth Amended Complaint. Weiss filed a Memorandum of Law in objection to the Preliminary Objections. The court sustained the Preliminary Objections and dismissed all counts against Boston with prejudice. The court concluded that Weiss did not aver that the TankSure marketing materials made claims that the Program "had any benefits or qualities that it does not have," and that the statements made in the TankSure promotional literature "at worst, constitute puffery." Trial Ct. Op. at 11. Fritch thereafter settled the claims remaining against it.

Weiss appealed the court's orders sustaining Boston's Preliminary Objections to Weiss's Second and Fifth Amended Complaints and dismissing

his claims of negligence and UTPCPL claims against Boston. Weiss raises the following issues:

> 1. Whether the trial court erred on December 6, 2016 in sustaining [Boston]'s Preliminary Objections to the Second Amended Complaint based on the Gist of the Action Doctrine for the same reasons as those set forth for co-Defendant Fritch and striking all claims against [Boston] without prejudice?
>
> 2. Whether the trial court erred on May 1, 2017 in sustaining [Boston]'s Preliminary Objections to the Fifth Amended Complaint as to the claim asserted pursuant to the [UTPCPL] and dismissing [Boston] from the litigation with prejudice?

Weiss's Br. at 5.

Our standard of review on an appeal from an order sustaining preliminary objections in the nature of a demurrer is "to determine whether the complaint adequately states a claim for relief under any theory of law." **Mistick, Inc. v. Nw. Nat'l Cas. Co.**, 806 A.2d 39, 42 (Pa.Super. 2002) (quotation marks and citation omitted). We must accept as true "all material facts as set forth in the complaint, as well as all inferences reasonably deducible therefrom." **Bilt-Rite Contractors, Inc. v. The Architectural Studio**, 866 A.2d 270, 272 (Pa. 2005). If there is any doubt about whether the demurrer should be sustained, then it should be overruled. **Bruno v. Erie Ins. Co.**, 106 A.3d 48, 56 (Pa. 2014).

## I. Gist of the Action

Weiss first argues that the trial court erred in dismissing his negligence claim against Boston on the basis of the gist of the action doctrine. The court concluded that the doctrine applied to bar the negligence claim in the instant

- 10 -

case because any duty to advise Weiss that his tank was sound arose from the contractual terms of the TankSure Program; the parties owed no duty to inspect or monitor Weiss's tank outside the terms of the contract. "[T]he question of whether the gist of the action doctrine applies is an issue of law subject to plenary review." *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 413 (Pa.Super. 2012) (citation omitted).

Weiss argues that the gist of the action doctrine does not bar his negligence claim because Boston's negligent actions were collateral to his contract with Fritch. Weiss cites *Bruno* for the proposition that tort claims can arise collaterally to a contract even though the relationship of the parties arose from a contract, and that, in such an instance, the gist of the action doctrine does not apply. Weiss elaborates that his negligence claim was not grounded in Boston's *failure to perform* any obligations under the contract, but in its *negligent performance* of the duties which arose from the contract.[6] More specifically, Weiss argues that Boston "acted in a negligent manner by making false or reckless assurances regarding the integrity of [Weiss's tank] and foregoing to recommend to [Weiss], through Fritch, to replace his [tank]." Weiss's Br. at 28-29. Weiss asserts that, aside from the actions of Fritch (which Weiss also imputes to Boston), Boston was negligent in designing

---

[6] "The crux of [Weiss's] allegations was not a failure to perform [contractual duties], [but] rather, negligen[t] conduct in [the] performance thereof." Weiss's Br. at 28.

- 11 -

TankSure, training Fritch's employees, entrusting Fritch's employees, and tracking and analyzing the collected TankSure data within the special database.

Weiss cites **Bilt-Rite** for the proposition that a negligence claim against a third party can survive in conjunction with a contract claim, so long as the tortfeasor is a business which provides information, for pecuniary gain, and the business reasonably forsees that the information will be relied upon by third parties in their business endeavors. Here, Weiss argues, Boston received money in exchange for maintaining and analyzing and relaying the TankSure test results, and Boston could have reasonably foreseen that it owed a duty of care to any final purchaser of the Program.

Finally, Weiss argues that Boston is liable for the negligent actions of Fritch because Fritch was acting with "apparent authority" on behalf of Boston. Weiss's Br. at 34. Weiss claims that he sufficiently pleaded an agency relationship by stating in the Second Amended complaint that Fritch and Boston were working "in conjunction," and that the pleaded facts demonstrate that Weiss reasonably believed that Boston had granted Fritch authority relating to TankSure. Weiss therefore not only argues that Boston's duties relating to the test of Weiss's tank—including developing TankSure, training Fritch's employees, and storing and analyzing data—were collateral to the terms of the contract with Fritch, and that *Boston* performed those duties negligently; but also that Fritch was acting as Boston's agent when performing

its data-collecting duties—duties that were collateral to the underlying contract—and that *Fritch* performed them negligently *on Boston's behalf.* On both points, we disagree.

The gist of the action doctrine "ensure[s] that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." ***Bruno***, 106 A.3d at 60. The "critical determinative factor" in determining whether a claim is a tort or breach of contract claim is "the nature of the duty alleged to have been breached." ***Id.*** at 68. In other words, a breach of contract action must be based on "a breach of any of the specific executory promises which comprise the contract"; if the breach is of a "broader social duty," then the claim is in tort, and the contract "is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." ***Id.*** at 70.

In the instant case, the Pamphlet states that Fritch would monitor Weiss's tank, through an ultrasonic tank test and analysis, in order to determine the need for a replacement due to corrosion. Weiss asserts Fritch was acting as Boston's agent, and that Boston also played a separate role in analyzing and reporting the data. Weiss does not argue that the parties failed to perform the test and track the data, but that the parties were negligent in the *performance* of this duty, because Weiss was not warned that his tank was corroded. This is an artificial distinction. The gist of Weiss's action is that the testing portion of the TankSure program failed. The complained-of actions are

not collateral to the contract, but arise solely from the specific promises made in the contract, and the failure to fulfill them. This is a contract claim.

To be sure, negligent performance of duties assumed by contract can give rise to a tort claim. But, in such an instance, the negligent act is collateral to the promises made in the contract. For example, if Fritch had broken an expensive doorknob while performing the test, or advised Weiss to clean his carpets with carbolic acid, such actions or statements would have fallen outside the duties imposed by the contract. Conversely, the duty to come to Weiss's house and properly perform a test to predict whether his tank would fail was a duty completely contemplated and mandated by the contract.

Weiss's reliance on *Bruno* is misplaced. In *Bruno*, a contract existed between a homeowner and home insurer for the detection and removal of mold. 106 A.3d at 51. The home insurer retained an adjuster and engineer, who gave false assurances to the homeowner regarding the toxicity of the mold, and the homeowner relied on these statements in deciding whether to renovate the basement of the house. *Id.* at 51-52. The homeowner sued the home insurer in tort for the negligent misrepresentations of the adjuster and engineer. *Id.* at 52. The Supreme Court held that the claim was not barred by the gist of the action doctrine. *Id.* at 70-71. It explained that the representations regarding the toxicity of the mold were collateral to the duties imposed by the contract, and the insurer's duty to maintain reasonable care in making such statements arose from the general social policies underlying

negligent misrepresentation. *Id.* Here, conversely, the duty to inspect Weiss's tank was at the heart of the TankSure program. According to the Second Amended Complaint, Fritch (or Boston, through Fritch) did not relate the results of the test incidentally to the duties imposed by the contract, but as required under the contract.

*Bilt-Rite* likewise affords Weiss no relief. In *Bilt-Rite*, the Supreme Court held that an architect who designed plans for public construction contract could be held liable for negligent misrepresentation to the building contractor using those plans, despite the fact that there was no privity of contract between the parties. 866 A.2d at 285. Here, however, Weiss asserts that there is privity of contract, and *Bilt-Rite* therefore does not apply.[7] The trial court did not err in dismissing the negligence claim against Boston, as pleaded in the Second Amended Complaint, pursuant to the gist of the action doctrine.

_____

[7] We note that the Certificate identifies Boston as a party, and clearly states that Boston disclaims certain liabilities under the TankSure Program. *See Casey v. GAF Corp.*, 828 A.2d 362, 369 (Pa.Super. 2003) (a disclosed or partially disclosed principal can be subject to liability upon contracts made by an agent acting within its authority). If, instead, Boston were not a party to the contract, and did in fact (as alleged by Weiss) assume some responsibility in generating the results of the tank testing, then Boston would have been subject to tort liability. *See, e.g., Bilt-Rite*, 866 A.2d at 285 (holding design professional liable for negligent misrepresentation for faulty architectural plans sold to foreseeable third party); *Evans v. Otis Elevator Co.*, 168 A.2d 573, 576 (Pa. 1961) (holding elevator inspector liable for negligent inspection to third-party victim); *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 619 (Pa.Super. 2017) (holding corporation managing a nursing home liable for negligence in providing care to third-party residents).

## II. Unfair Trade Practices

In his second issue, Weiss argues that the court erred in sustaining Boston's Preliminary Objections to his Fifth Amended Complaint and dismissing his claims under the UTPCPL. "The UTPCPL is Pennsylvania's consumer protection law and seeks to prevent unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Knight v. Springfield Hyundai*, 81 A.3d 940, 949 (Pa.Super. 2013). "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *McCabe v. Marywood Univ.*, 166 A.3d 1257, 1263 (Pa.Super. 2017) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

In his Fifth Amended Complaint, Weiss claimed that Boston engaged in deceptive trade practices violating portions of 73 P.S. § 201-2(4), "including, but not limited to" subsections (ii) through (v). On appeal, however, he asserts that Boston violated subsections (v), (vii), (ix), and (xxi). Because Weiss made no argument regarding subsections (vii), (ix), and (xxi) before the trial court, Weiss's arguments related to those subsections are waived. *See* Pa.R.A.P. 302 (issues may not be raised for the first time on appeal). We will therefore only consider whether the trial court erred in dismissing Weiss's claim that Boston violated subsection (v).

Subsection (v) of the UTPCPL prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have[.]" 73 P.S. § 201-2(4)(v). Weiss argues that he relied on the "deceptive representations and assurances" made by Boston, and Fritch through Boston, in the TankSure Pamphlet, the website, and Facebook page, "in deciding to enroll and annually re-enroll in the TankSure Program," and contends that these representations "would be deemed unlawful by the UTPCPL." Weiss's Br. at 37-38.[8]

The statements that Weiss asserts are unlawful fall into two general categories. In the first category are the statements made on the TankSure website and Facebook page, which make such claims as that Tanksure "is the fuel oil industry's standard for evaluating the safety and integrity of aboveground oil tanks," and that the ultrasonic testing methods used by Tanksure are "endorsed by insurance companies and State Environmental Protection Agencies"; "have been successfully utilized . . . in a variety of

---

[8] Weiss also argues that the economic loss doctrine, which bars recovery in negligence actions where no physical injury or property damage occurred, does not apply to his UTPCPL claims (and, additionally, that he suffered physical injury and property damage). Because the trial court did not reach this issue, and because we dismiss Weiss's claims on other bases, we need not discuss it further.

industries and scenarios for over 30 years"; and are approved by the EPA and API.

Regarding these statements, we agree with the trial court that Weiss failed to allege sufficient facts to conclude that these statements are deceptive. Weiss did not argue in his Fifth Amended Complaint, and does not assert on appeal, that, for example, the TankSure methods have not been in use for "over 30 years," that the methods vary from those approved or endorsed by the EPA and API or insurance companies. Weiss has failed to clarify in what way these statements could be construed as misleading, and we therefore affirm the trial court's dismissal of his claims in relation to those statements.

In the second category are the statements contained in the Pamphlet, which include the claims that Fritch "has the ability to predict when your oil tank will fail, and will be able to replace it prior to that time," and "by analyzing [the ultrasonic test] measurements [Fritch is] able to determine the integrity of your tank." We disagree with the trial court's conclusion that Weiss failed to allege that these statements are deceptive. Weiss alleged in the Fifth Amended Complaint that, in direct contradiction with the statements, Fritch did not have the ability to predict when his oil tank would fail, was not able to replace it prior to failure, and that the ultrasonic test measurements were not able to determine the integrity of Weiss's tank.

However, we conclude that Weiss's UTPCPL claim as related to these statements is barred by the gist of the action doctrine, and therefore affirm the trial court's dismissal of these claims in the Fifth Amended Complaint. ***See Richmond v. McHale***, 35 A.3d 779, 786 n.2 (Pa.Super. 2012) ("[W]e are not bound by the rationale of the trial court and may affirm on any basis").[9]

Our decision is guided in part by ***Knight***, in which the plaintiff complained that a car dealership misrepresented, among other things, the vehicle's mileage, accident history, ownership history, that the dealership would send paperwork to the state, and that she would be eligible for refinance after six months. 81 A.3d 940 at 951. We concluded that that the gist of the action doctrine did not bar the plaintiff's UTPCPL claims because the misrepresentations occurred before the entry of the contract, were collateral to the contract, and sounded in tort. ***Id.*** Implicit in our holding was the converse: if the alleged misrepresentations were *not* collateral to the contract, they would be bared by the gist of the action doctrine. ***See also Romeo v. Pittsburgh Assocs.***, 787 A.2d 1027, 1033 (Pa.Super. 2001) (stating that disclaimer for injury from stray balls, on back of ticket to baseball game, could defeat claim under the UTPCPL).

---

[9] Given this holding, we need not review the trial court's conclusion that the statements constituted puffery and for that reason were not cognizable under the UTPCPL.

- 19 -

Here, unlike in **Knight**, the statements that Fritch had the ability to predict when Weiss's tank would fail went to the heart of the contract obligations. Weiss's complaint is not that Boston, through Fritch, made statements unrelated to the terms of the contract. Weiss's complaint is that TankSure failed to detect the integrity of his tank, as was promised by the contract. However, this scenario was contemplated by the Program: the Certificate references the possibility of an oil leak, and outlines the liability of the parties in that event. Weiss cannot re-brand as false advertising a claim that Fritch and Boston failed to successfully perform obligations arising from the contract.[10] We therefore affirm the trial court's dismissal of the UTPCPL claims in relation to these statements as well.

Orders affirmed.

---

[10] In any event, Weiss's claim fails as a matter of law because he did not allege facts supporting a conclusion that he justifiably relied on the advertising statements indicating that Fritch could detect with 100% accuracy when his tank would fail. **See Yocca**, 854 A.2d at 439 (affirming sustaining of preliminary objections where plaintiff did not justifiably rely on representations in sales brochure; alleged misrepresentations were belied by the contract terms, and constituted parole evidence). **Cf. Toy v. Metro. Life Ins. Co.**, 928 A.2d 186, 206-08 (Pa. 2007) (holding that UTPCPL claims based on insurance agent's pre-sale misrepresentations regarding policy features amounted to claim for fraud in execution, and were therefore not barred by parole evidence rule); **Boehm v. Riversource Life Ins. Co.**, 117 A.3d 308, 327 (Pa.Super. 2015).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/25/18</u>